**ASTRONAUTICS CORPORATION OF AMERICA**

v.

**The UNITED STATES.**

**No. 144–67.**

United States Court of Claims.

Jan. 22, 1971.

Robert D. Witte, New York City, attorney of record, and Samuel Paige, New York City, for plaintiff, Paige & Paige, New York City, of counsel.

Frances L. Nunn, Washington, D.C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS and SKELTON, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM.

This case was referred to Trial Commissioner William E. Day with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on January 13, 1970, wherein such facts as are necessary to the opinion are set forth. Plaintiff filed a request for review by the court and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff is not entitled to recover, plaintiff's motion for summary judgment is denied, defendant's cross-motion is granted and plaintiff's petition is dismissed.

## OPINION OF COMMISSIONER

DAY, Commissioner:

This is a suit by which the plaintiff seeks recovery of some $400,000 which it says it expended in its efforts to produce under a fixed price supply contract which was terminated for default. No issue concerning excess costs for reprocurement is presented. The plaintiff claims entitlement to the benefits of the termination for convenience clause of the contract, or in the alternative, an equitable adjustment in price under the changes article of the contract, because of alleged impossibility of performance.

The plaintiff entered into a contract with the Department of the Air Force on or about May 3, 1960, as a result of an advertised invitation for bids. The contract [No. AF 33(600)–41365] required the production and delivery to the defendant of 131 MK–2 pressure ratio transducers, of which four were preproduction samples.

The delivery schedule required submission to the defendant of all preproduction samples, properly tested, within 130 days from the date of award. This date was extended by mutual agreement, from time to time, to February 28, 1961. The preproduction samples submitted by that date were found to be "not in compliance with the contract specifications" by the defendant, and on May 9, 1961, the contract was terminated for default under General Provision 11 (Default). The plaintiff appealed that action to the Secretary of the Air Force. The matter was referred to the Armed Services Board of Contract Appeals which conducted extensive hearings covering 8 days. On March 21, 1967, the ASBCA denied the appeal.

The matter is before the court for its review under the provisions of the Wunderlich Act (68 Stat. 81, 41 U.S.C.A §§ 321, 322 (1964)). The scope of review

under such Act is fully covered in this court's opinion in Koppers Company, Inc. v. United States, 186 Ct.Cl. 142, 405 F.2d 554 (1968), and will not be repeated here. The question to be decided, as that case teaches, is whether there is substantial evidence to support the Board's findings—or negatively stated —whether there is evidence overwhelmingly contrary to the findings made by the Board, and therefore, an absence of substantial evidence to support its conclusions. I am of the opinion that the decision of the ASBCA is fully supported by the evidence and that the plaintiff's petition should be dismissed. The facts, as found by the Board or disclosed by the record, follow.

The subject matter of the contract in suit was a device variously called a pressure ratio transmitter, and a pressure ratio transducer, (an airplane component). In laymen's language, as found by the Board:

> The MK–2 pressure ratio transducer is a device which accepts two input pressures, which are designated PT–7 and PT–2. The PT–7 pressure is derived from the exhaust of the jet engine. The PT–2 pressure is derived from the inlet of the jet engine. These pressures are fed through pressure lines and fed into the MK–2 transducer. The transducer then accepts these pressures through the bellows mechanism and takes the ratio of these two pressures through an electromechanical technique. An electrical signal is developed in the device which represents the ratio of these two pressures and this signal is transmitted to an indicator which is located in the cockpit of the aircraft. The pilot of the aircraft then uses this pressure ratio as an indication of the thrust which he is getting from his engine and uses this indication in the proper setting of the throttle controls or what have you of the engine.

The plaintiff's case was presented to the Board on the theory that the contract was impossible of performance since, as the plaintiff contended there, the preproduction samples were to be produced in compliance with the particular military specification amendment 2. A further contention was made that plaintiff was precluded from coming forth with excuses for nonperformance after the government's warning or show-cause letter was issued before the termination notice was sent. The decision of the ASBCA here under attack was that the applicable contract specification at the time of termination was not amendment 2, but rather amendment 3, to the military specification. While no detailed findings as to impossibility of performance as to amendment 3 were made, it was found by the Board that another contractor (Minneapolis-Honeywell) was producing the same item under a separate contract. This is merely another way of stating that the contract was possible of performance.

Pressure ratio transducers are not new. They had been manufactured and delivered previously by several manufacturers as contractor-furnished components on military airplanes. Also, they previously had been produced under direct contracts with the government, to less severe specification requirements than the contract in suit. The contract as let to the plaintiff required the production according to Air Force Specification MIL–T–25485A dated May 1956 and amendment 2, dated January 4, 1960. Requests for bids were issued February 12, 1960, with the bid opening date set at March 2, 1960. The contract specifications were performance-type specifications. They prescribed the ultimate requirements of the items to be produced, but left the design to the contractor for accomplishment.

The plaintiff's bid, which was accepted by the defendant on May 3, 1960, called for delivery of the first set of preproduction samples within 90 days after written notice of award, and the second set of preproduction samples within 130 days of written notice of award. The contract as let contained

the following provisions relating to preproduction samples:

1. Four (4) each of Item 1.1 three (3) of which are in addition to the quantity called for under Item 1.1 and the price of which (the aforesaid three) is included in the price of said Item 1.1, are designated as Preproduction Samples. These Preproduction Samples shall be submitted in two sets as follows:

First Set: One (1) each sample of this set shall be subjected to all tests specified by Specification MIL–T–25485A and Amendment No. 2 thereto with the exception of the tests specified by paragraphs 4.4.16, 4.4.17 and 4.4.18 (humidity, salt spray and fungus tests) of Specification MIL–T–5350B referenced by Specification MIL–T–25485A and Amendment No. 2 thereto. The remaining one (1) each sample shall be untested.

Second Set: Both two (2) samples of this set shall be fully tested including the humidity, salt spray and fungus tests referenced above.

These tests may be conducted at the contractor's plant or at an approved testing laboratory witnessed by an Air Force Inspector. Upon successful completion of said tests, said Preproduction Samples, accompanied by pertinent test reports prepared in accordance with Specification MIL–T–9107 (USAF) and certified by an authorized official of the organization performing same shall be delivered, all transportation charges prepaid, to the consignee listed in paragraph 2(a) below, in accordance with Schedule Provision "G" hereof. (Said test reports shall be submitted with each of the two sets of said Preproduction Samples and shall cover the applicable tests pertaining to each Preproduction Sample Set.) The contractor will be notified in writing 15 days after receipt by the Government of the second set of Preproduction Samples (or sooner at the Government's prerogative) as to approval or disapproval of the Preproduction Samples. After evaluation, three (3) each of the Preproduction Samples shall be retained by the Laboratory referenced in paragraph 2(b) below, and the remaining one (1) Preproduction Sample shall be returned to the contractor, at the contractor's expense, in its then condition, for submission as a production item, provided all worn, broken or defective parts are replaced or repaired by the contractor at no expense to the Government. Pending approval of said Samples, the contractor may fabricate but not deliver any of the remaining articles called for hereunder; provided, however, that in event the Preproduction Samples reveal discrepancies from Specification requirements, the contractor shall make the necessary changes in the fabricated articles to correct such discrepancies at no cost to the Government. During the performance of any tests to determine compliance with the applicable specification, the Government shall not be liable for any damage to or loss of said Samples. *If changes in specifications are required as a result of the tests, the same shall be processed in accordance with the clause entitled "Changes" in General Provisions hereof.* [Emphasis supplied.]

\*    \*    \*    \*    \*    \*

3. If the contractor fails to deliver the Preproduction Samples and Test Reports within the time set forth herein or any extension thereof, the contractor shall be deemed to have failed to make delivery within the meaning of (a) (i) of the clause hereof entitled "Default."

4. If, following any submission or resubmission under this clause, tests reveal discrepancies in the Preproduction Samples from the specification requirements, the Government may, at its option, either (i) terminate this contract in accordance with the terms of (a) (i) of the clause hereof entitled "Default," or (ii) notify the contractor in writing of the discrepancies and specify an extension of the time set

forth herein, in which event the contractor shall correct and resubmit the Preproduction Samples at no cost to the Government.

On September 20, 1960, the plaintiff submitted three preproduction samples and a test report to the Air Force Flight Control Laboratory. The items did not meet the contract specifications and amendment 2. The major reasons for rejection of the transducers were as follows:

\* \* \* \* \* \*

a. Astronautics indicates that these items are not representative of the final production version. Changes being made include materials, castings, electronic components, sealing and mechanical components and weight reduction processes.

b. Test Report TR 11290–1002 shows the transmitters do not meet the specification tolerances.

c. The Test Report is incomplete. The specification states that the contractor shall subject three (3) transmitters to all of the preproduction tests. With the exception of room temperature scale error tests, three (3) transmitters were not subjected to all tests.

3. Not one test called out in the specification has been successfully completed by the contractor's items, therefore, they must be considered as a 100% failure on a production item basis. Defects in the items submitted are too numerous to list at this time \* \* \*.

On September 26, 1960, the contracting officer notified the plaintiff that the government considered the plaintiff's failure to submit four satisfactory preproduction samples as a condition endangering performance of the contract in accordance with its terms.

The contracting officer, on October 28, 1960, wrote to the plaintiff advising that a change in the test program as suggested by the plaintiff was not acceptable, and that the endurance and fungus tests were required in conjunction with the other tests to be accomplished on preproduction models and not prototypes. He stated further that no deviations from the specification requirements can be allowed. The plaintiff was asked to advise by November 4, 1960, as to the minimum period of time by which it could submit four samples completely tested in accordance with the contract, together with completed test reports applicable.

The plaintiff, having been granted a short extension of time to reply to the above-referenced letter, on November 6, 1960, sent the following letter to the contracting officer:

Subject: Contract AF 33(600) 41365 Transmitter, Thrust Type Mk–2 Amending of

Reference: (a) AMC, ASC, LMEAI, D. E. Phillips letter dtd 28 October 1960 to ACA

1. Reference (a) advises that endurance and fungus testing must be included in the testing of the preproduction units. Accordingly, the time element necessary to complete the testing program is ninety-one (91) days. This time is necessary based on sequence of testing specified in your reference (a).

2. The Astronautics Corporation of America can submit four (4) samples, completely tested in accordance with the contract, plus completed test reports applicable thereto during the month of February, 1961.

3. Production quantities are presently being assembled which will enable Astronautics Corporation of America to deliver units at a monthly rate in excess of the contract schedule. Therefore, if desired, Astronautics Corporation of America will be in a position to deliver tested production units, in full compliance with specifications, sixty (60) days in advance of the completion of fungus and endurance tests on the four (4) samples.

4. In consideration for the extension of time, Astronautics Corporation of America is confident that its efforts

will result in a more reliable unit, fully meeting the exacting standards of the Air Force. Although Astronautics Corporation of America has incurred expenditures in excess of the contract price, it is willing, as further consideration, to consent to a reduction in price of two dollars ($2.00) per unit.

5. Astronautics Corporation of America appreciates the courtesy extended to it and wishes to assure the Air Force of its earnest and sustained efforts to comply with the subject contract.

By letter of February 8, 1961, the plaintiff was notified by a contracting officer that the government considered the plaintiff's inability to submit three preproduction samples as required by the contract (and amendments thereto) by February 28, 1961, a condition that is endangering performance of the contract. The letter concluded as follows:

2. Therefore, unless such condition is cured, within eighteen (18) days after receipt of this letter, but no later than 28 February 1961, the Government may terminate subject contract for default under General Provisions Nr. 11 (Default).

On February 17, 1961, the plaintiff advised that one untested and one tested preproduction transmitter, together with applicable test report would be shipped on February 28, 1961, to the appropriate government office for evaluation. The letter further advised that the second set of preproduction samples would be delivered in March, immediately after completion of the 28-day fungus test.

Two transmitters were shipped on or about March 2, 1961. The test report relating to one of these transmitters (Serial 008) had been submitted on February 28. This test report showed that three required tests had not been accomplished as to this unit (Serial 008). These were humidity, salt spray and fungus tests. The second transmitter (Serial 009) had not been tested at all. An evaluation of the test report on Serial 008 resulted in the determination communicated to the plaintiff that both samples were rejected by reason of failures in many respects to meet specification requirements. While the evaluation (p. 317 of Board file) stated that the item tested did not comply with the requirements of Specification MIL–T–25485A (USAF) amendment 2, the evaluation was made and the test report (p. 45 of government exhibit C) [1] showed that the item was produced and tested by the plaintiff in accordance with, and evaluated by the defendant to the relaxed requirements of amendment 3 to the specifications. It failed to comply with such specifications in a large number of areas which were detailed in a written report (p. 317, et seq. of ASBCA record) communicated to the plaintiff.

The plaintiff was given a further opportunity to submit preproduction samples and test reports by April 5, 1961. An incomplete test report (no test data as to six separate areas was included) was submitted on April 4, 1961. It showed several areas of noncompliance with the specifications. (ASBCA record, p. 321, et seq.) This test report, covering Serial No. AF 60–006 shows on page 45 thereof (government exhibit C) that the unit was manufactured to and tested to amendment 3 of the specifications despite the plaintiff's insistence that it was made to conform to amendment 2 of the military specifications. On April 6, 1961, the plaintiff hand delivered another sample (No. 007) and test report. Its representatives admitted that the sample did not fully comply with the specifications. On April 11, 1961, the contracting officer sent the following letter to the plaintiff:

1. You are hereby notified that since you have failed to submit four (4)

---

[1] The essential difference was that amendment 2 called for a turbine discharge total pressure PT–7 from 2 to 180 inches of mercury, whereas under amendment 3 this was reduced to from 2 to 150 inches of mercury.

preproduction units and test reports (in accordance with applicable MIL Specification) within the time required by the terms of Contract AF 33 (600)—41365; and whereas, the preproduction samples and test reports which were delivered after the due date (28 February 1961) have been rejected as stated in our letter to Astronautics Corporation of America dated 24 March 1961, the Government is considering terminating said contract pursuant to General Provisions Nr 11 (Default). Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose out of causes beyond your control and without fault or negligence on your part.

2. Accordingly, you are hereby afforded the opportunity to present, in writing, any facts bearing on the question to Aeronautical Systems Division (LMEAIE), AFSC, WPAFB, Ohio with copy thereof to the undersigned for information within ten (10) days after receipt of this notice. Failure of the Contractor to present any excuses within this time may be considered as an admission that none exist. Your attention is invited to the respective rights of the Contractor and the Government under General Provisions Nr 11 (Default) and the liabilities that may be invoked in the event a decision is made to terminate for default of the Contractor.

3. Any assistance rendered to the Contractor on this contract or acceptance by the Government of delinquent goods or services hereunder, will be solely for the purpose of mitigating damages, and is not to be construed as an intention on the part of the Government to condone any delinquency, or as a waiver of any rights the Government may have under subject contract.

No reply to this so-called show-cause letter was ever received by the defendant.

Upon plaintiff's initiative, a conference between the procurement officials at Wright Patterson Air Force Base and plaintiff's officers was held on April 13, 1961. At this conference, the plaintiff's president was advised that since the plaintiff's units failed to comply with the specification requirements, it might wish to consider subcontracting the entire contract quantity to Minneapolis-Honeywell, a firm that had a separate contract for similar units on which it was then making deliveries.

In the meantime, the plaintiff had requested [2] a telegraphic quotation from Minneapolis-Honeywell for 131 units to be manufactured in accordance with MIL–T–25485A USAF and amendment 3.[3] A reply from Minneapolis-Honeywell was made by telegram but delivered by phone on March 31, 1961. The reply called for full payment by plaintiff with the order.

Following the April 13, 1961 conference, and without replying to the show-cause letter of April 11, 1961, quoted above, the plaintiff, on April 18, 1961, wrote to the contracting officer as follows:

Subj: Contract AF33(600)–41365. Transmitter Thrust Synchro Pressure Ratio type MK–2 in accordance with MIL–T–2545A [sic] USAF and Amendment 3, Amending deliveries under.[4]

1. In order that the Air Force may obtain urgently needed subject MK–2 transmitters, the Astronautics Corporation of America proposes to subcontract a quantity of 100 units to Minneapolis-Honeywell. The balance of thirty-one units will be fabricated and delivered by Astronautics Corporation or Minneapolis-Honeywell.

2. Minneapolis-Honeywell will ship from its plant the subject transmitter,

2. This matter had been advanced by defendant's procurement officials earlier.

3. Underlining added for emphasis.

4. Underlining added for emphasis.

MH part LG 14C10 in accordance with provisions to be specified in the proposed contract amendment. Deliveries will be: 5 units 60 days from date of amendment, 10 units 90 days, 35 units 120 days and 50 units 130 days. The remaining thirty-one units in 180 days will be delivered either from Astronautics Corporation or Minneapolis-Honeywell pending results of qualification testing of Astronautics Corporation's units.

3. It is assumed that MAPD's show cause letter to Astronautics Corporation of 11 April 1961 is withdrawn on basis of this reply.

Since subcontracting only a portion of the 131 units was not acceptable to the defendant, the contract was terminated for default on May 9, 1961.

While plaintiff's witnesses testified that the military specification as amended by amendment 2 was impossible of performance, and that all efforts had been directed toward compliance with that specification, it is clear (as the Board found) that the contract was amended so as to make amendment 3 the *controlling specification*. This is so, despite the admission otherwise by defendant's trial counsel before the ASBCA. It is undoubtedly true that by not later than December 9, 1960 (when the plaintiff received amendment 3 to the contract, effective November 17, 1960), the contract had been amended to relax the overpressure requirement and to make amendment 3 applicable to the contract.

The plaintiff argues that although amendment 3 was to apply to the production units, amendment 2 still was applicable to the preproduction units. This argument overlooks the fact that the preproduction units were to be four each of item 1.1, and item 1.1 was (by contract modification 3) to be produced in accordance with amendment 3 to the military specifications. Why would anyone want a prototype to be manufactured to a higher standard than a production unit? The Board has quoted letters drafted by the plaintiff's president which clearly show that the plaintiff knew that amendment 3 was the controlling specification. The telegram referred to above is further support for this, because it was a quotation in response to an inquiry by the plaintiff and specifically referred to the military specification and amendment 3.

The plaintiff contends further that the contract was impossible of performance, even if the court should find that the military specification as amended by amendment 3 was the controlling specification. There is in the record, however, documentary evidence that Minneapolis-Honeywell was (at the time of plaintiff's difficulties) producing substantial quantities of transmitters under contract AF 33 (600)–42492, which fully complied with the military specification and amendment 3. There is no evidence in the record that any waiver of these specifications was given to Minneapolis-Honeywell as to that contract. Plaintiff's suggestion that a slight waiver was given to that firm a year later on another contract (not awarded until June 26, 1961) does not show that performance to amendment 3 was not possible of accomplishment.

On the entire record, it is found that the termination of the contract in suit for default because of the inability of the plaintiff to produce acceptable preproduction samples was a proper action by the defendant, and the exercise of a right reserved to it by the terms of the contract.

The action of the ASBCA in denying the plaintiff's appeal is fully supported by the record.

Accordingly, the plaintiff's petition should be dismissed.

## CONCLUSION

Upon the foregoing opinion, plaintiff is not entitled to recover, its motion for summary judgment is denied, defendant's cross-motion is granted and plaintiff's petition is dismissed.