**UNIVERSAL CONTRACTING AND BRICK POINTING CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 4–86C.

United States Claims Court.

March 26, 1990.

Kenneth B. Weckstein, Washington, D.C., for plaintiff.

Terrence S. Hartman, with whom were Asst. Atty. Gen. Stuart M. Gerson, Director David M. Cohen, and Asst. Director Thomas W. Petersen, Washington, D.C., for defendant.

## ORDER

LYDON, Senior Judge:

This contract case comes before the court on motions for summary judgment filed by the parties. Defendant's motion for summary judgment seeks dismissal of

all four counts of the complaint, whereas plaintiff seeks summary judgment on only one count of the complaint. Plaintiff asserts that factual disputes preclude the granting of summary judgment on the other three counts of the complaint. Upon consideration of the submissions of the parties and oral argument, the court concludes that factual disputes warrant denial of the parties' motions for summary judgment.

### FACTS

On September 7, 1982, the Veterans Administration (VA) awarded contract number V533C465 to plaintiff Universal Contracting and Brick Pointing Company, Inc. (Universal). The contract states, in relevant part, "Contract For (Work to be performed) Chemical removal of paint for exterior of Bldgs # 15, # 17 and # 16."

Section 4.03 of the contract provides:

BUILDING DESCRIPTION AND BACKGROUND:

The building is a three-story building with a flat roof, parapet walls, cornice, aluminum windows, with exterior face brick. The face brick has a glazed coating and has been painted several times with a Renuit paint system. The paint system has failed in many spots and has peeled; however, in some areas the paint has bonded to the brick. Recently, the building was scraped mechanically to remove the loose paint. The purpose of this specification is to remove the rest of the paint by chemical means and hydro cleaning.

Section 4.11 of the contract provides, in part, as follows:

CLEANING PROCESS:

A. Cleaning materials shall be thoroughly mixed according to instructions on manufacturer's printed label (container label).

B. Paint stripper shall be applied by brush. Apply a heavy thick coating. Allow the paint stripper to remain on the surface for a sufficient time as determined during the tests. The coated areas shall be rinsed from the bottom up with clear water applied at a pressure of 300 to 500 PSI. Gun used to apply water shall be equipped with not less than a 15 [degree] spray tip. All tips shall be fan type. Re-apply paint stripper where necessary. Remove all paint coatings using this product and process. Under no circumstances shall the water pressure be high enough to erode or harm the face brick or damage the mortar joints to any appreciable extent.

Prior to 1982, certain buildings at the VA Medical Center (VAMC) in Castle Point, New York, had two coats of Renuit Exterior Wall Resurfacer (Renuit) applied to their exterior walls in the years 1959–1960, 1970 and 1975. At least six coats of Renuit were applied to the three buildings covered by Universal's contract, buildings 15, 16, and 17, between those years. Defendant maintains that VA records show that buildings 15, 16, 17 *and* 18 received identical Renuit treatments.[1] Renuit contains a "chemical base incorporating mica, silicious minerals, pure earth, and chemically-treated pigments, which are embedded together in a waterproof vehicle." Renuit also contains asbestos.[2]

In 1981, the VA decided to remove the Renuit "paint system" from the buildings so treated at the VAMC.[3] In the spring of 1982 the VA, through Joseph Kajor (Kajor), Chief of Engineering Service, retained a laboratory in New York City to advise the VA on the proper chemical remover for Renuit. Kajor's affidavit states that the VA received a lab report which recommended Sears' and Formby's paint rem-

---

1. Defendant also claims that buildings 8, 9, 44, and 54 received Renuit treatments, but the VA records are not clear regarding the number of treatments on these buildings.

2. Although the government refused to admit that Renuit contains asbestos in its answer to plaintiff's request for admissions number 22, the government has since submitted evidence to the court indicating that Renuit does contain

asbestos. Presumably this point is no longer in dispute.

3. The parties seem to agree that the Renuit "paint system" is not a paint but rather an exterior wall resurfacer. The manufacturer's literature expressly advertises that Renuit is not a paint.

overs to remove Renuit. Kajor's affidavit also states that the VA was informed by the lab over the phone that Renuit contains asbestos. The affidavit also states that the manufacturer of Renuit would not recommend a chemical remover or reveal the chemical contents of Renuit when requested to do so by the VA. It was not until April 15, 1986, that the makers of Renuit disclosed to the VA by letter that in 1959 Renuit contained 21.64% asbestos, and from 1970 through 1975 Renuit contained 15.67% asbestos.[4]

The VA awarded a total of four contracts between 1982 and 1983, including Universal's, to remove exterior materials from the walls of buildings 8, 9, 15, 16, 17, 18, 44 and 54 at the VAMC.[5]

The VA awarded the first contract for removal of the Renuit "paint system" to Merritt–Meridian Construction Corporation (Merritt–Meridian) on August 31, 1982, for building 18. The second contract for removal of the Renuit "paint system" was awarded to Universal on September 7, 1982, for buildings 15, 16, and 17. Both of these contracts contain specifications which state that "[t]he paint removal materials shall be Formby's ... Sears ... or SI No. 6 paint and varnish remover ... or their equals."

The VA awarded a contract for "paint removal" to Chris Waterproofing Corporation (CW) for buildings 8 and 9 on July 7, 1983, and the VA awarded a contract for "paint removal" to Ganem Contracting Corporation (Ganem) for buildings 44, 54 and the penthouses of buildings 15, 16 and 17 on August 12, 1983. Neither of these contracts mentions Renuit, and both contracts contain identical specifications which state that "[t]he paint removal materials shall be Sure Klean Heavy Duty Paint Stripper ... or their equals."

Like Universal's contract, Merritt–Meridian's contract specifications did not specify or mention Sure Klean, but the subcontractor for Merritt–Meridian proposed to use Sure Klean as the chemical remover under the "or their equals" clause in the contract, and after a successful test, the VA approved its use. Merritt–Meridian's contract was completed without difficulty on August 9, 1983, although work was suspended during cold weather. Merritt–Meridian used high pressure hot water to flush Renuit off the brick, although like Universal's contract, Merritt–Meridian's contract does not specify a water temperature for the rinsing process.

Defendant contends that all of the buildings covered by these four contracts were treated with Renuit in various amounts, but plaintiff correctly points out that neither CW's nor Ganem's contract specifications mention Renuit, while the contract specifications in the contracts of Universal and Merritt–Meridian expressly state that the buildings have been treated with the "Renuit paint system."

On October 20, 1982, about forty-five days after Universal was awarded the contract in dispute, the VA issued Universal a Notice to Proceed, which established December 4, 1982 as a completion date (forty-five calendar days). Universal proposed to use the chemical remover KRC MC–25, under the "or their equal" clause of the contract specifications for chemical removers. The proposed remover was tested and approved for Universal's use by the VA.

On November 17, 1982, due to cold weather, the VA's contracting officer (CO) granted Universal a time extension of 210 calendar days, and established a new completion date of June 30, 1983. Although Universal requested that it be allowed to resume work earlier in May, work was actually resumed on May 31, 1983. When Universal began to have problems removing the exterior material from the buildings, the VA's Resident Engineer Ronald Klimas (Klimas) recommended that Univer-

---

**4.** In plaintiff's Request for Admissions number 22, dated October 3, 1986, however, defendant refused to admit "that Renuit Exterior Wall Resurfacer contains asbestos."

**5.** The specifications for all four contracts are entitled "Specifications for the Removal of Exterior Paint from Buildings ____." Only Universal's and Merritt–Meridian's contracts state that the buildings (15, 16, 17, & 18) have been treated with Renuit.

sal use the chemical remover Sure Klean, and on June 1, 1983 Klimas approved Universal's use of this remover.

Plaintiff continued to experience difficulties in performing the contract even after switching to Sure Klean. In his deposition, one of Universal's foremen, Daniel Tronco (D. Tronco), described the nature of the problems with the job, and the methods he used:

Well, the method was according to specs. The specs supply us with the method. We had to use their method. We weren't given the choice of using our own. The method was [Sure Klean] heavy duty paint stripper to be applied in accordance with its directions and to be removed with high pressure water.

. . . .

The only place the material came off, not easily but came off, is in the weathered areas as you seen in the pictures. Whatever was weathered, it would peel the loose stuff off. As soon as you got to the solid material it was back to the same old thing.

By letter dated June 27, 1983, Andrew Tronco (A. Tronco), president of Universal, informed the VA that "an additional 90 days is needed to complete this project" and "you [the VA] are aware of the difficulty we are encountering in trying to remove this material from the exterior walls."

By letter dated July 21, 1983, the VA informed A. Tronco that his request for a ninety-day extension of time on the contract would be granted.

On three separate occasions, in August, September and October of 1983, Universal tested the material it was removing from the buildings at the VAMC by sending it to Ambric Testing, Inc. (Ambric) for analysis. Universal's evidence of the test results indicates that the material removed from the exterior walls of the buildings contained, among other things, asbestos, which comprised 30% to 85% of the material being removed. According to Universal, the samples analyzed in August 1983 came from building 17. Its not clear from the materials at hand if this is so. It is also unclear

from which buildings the samples for the September and October tests were taken.

On September 21, 1983, the VA approved an amendment to Universal's contract specifications regarding the rinsing process. Before the amendment, the specifications in Universal's (and Merritt–Meridian's) contract called for rinsing the buildings from the bottom up with pressurized water at 300 to 500 PSI, with no temperature specified. After the amendment, the rinsing specifications of Universal's contract were identical to those contained in the contracts of CW and Ganem, i.e., to rinse from the top down with water heated to between 200 and 240 degrees Fahrenheit, and pressurized at 1200 PSI. A memorandum, dated September 21, 1983, was sent from the Chief of Engineering Service for the VA to the CO, in reference to "Chemical Paint Removal, Building #15, #16, #17, Contract Number V533C465, Proj. No. 81–1100(2), Amendment to Specification, Section 4.11 Cleaning Process," stating that "Engineering has approved the use of clean water applied at a pressure of 1200 PSI heated from 200 [degrees Fahrenheit] to 240 [degrees Fahrenheit] in rinsing the areas of the building coated with the chemical."

A contract progress report for the period ending September 30, 1983 indicates that 29.6% of the work on Universal's contract had been completed by that date, and that the average work force per day totaled three. A contract progress report for the period ending October 31, 1983 indicated that 84% of the work had been completed, and that the average work force per day was four. Universal's payroll records reflect the fact that in July and August 1983, Universal had only two or three workers on the VAMC job, but in September 1983 there were generally three workers on the job, and thereafter there were five workers on the job until the project was substantially completed, on November 28, 1983.

By letter dated August 23, 1984, Universal made a claim to the CO for $95,315, advancing alternative theories of breach of contract or equitable adjustment to the con-

tract. By letter dated January 3, 1985, the CO denied Universal's claim.

Plaintiff filed its complaint in this court on January 3, 1986, seeking an equitable adjustment to the contract in the amount of $95,315. Plaintiff's complaint contains four counts, alleging alternative theories of cardinal changes to the contract (count I); defective specifications (count II); differing site conditions (count III); and the government's failure to disclose superior knowledge (count IV).

The parties' major areas of disagreement focus on the conditions Universal encountered in performing the contract, and on Universal's performance of its contract vis-a-vis the performances of the other three contractors. For example, the parties dispute whether the buildings on which the other contractors worked were coated with the same materials, and in the same amounts, as the buildings on which Universal worked, whether Universal supplied sufficient and competent workers on the job site, and whether Universal's work crew employed proper and efficient work methods.

Defendant claims that the other three contractors encountered no unusual difficulty in removing the material from the exteriors of their buildings. In support of this contention, defendant submits affidavits from representatives of the other three contractors, describing the cleaning methods they followed. The affidavit of the vice-president of Ganem, the contractor that performed the work on buildings 44, 54, and the penthouses of buildings 15, 16 and 17, stated that Ganem applied the chemical remover Sure Klean, and after one to four hours, hosed it off with pressurized hot water at 600 PSI. The affidavit stated that one application of Sure Klean was usually sufficient, but occasionally two or three applications were required.

The affidavit of the president of CW, the contractor that performed the work on buildings 8 and 9, stated that CW applied Sure Klean, left it on for about four hours, and rinsed it off with pressurized water at 1200 PSI. CW's president maintained that CW found cold water rinsed effectively,

and it was not necessary to use hot water. He also stated that occasionally two or three applications of Sure Klean were necessary.

The affidavit of an official of Clean–It, the subcontractor for Merritt–Meridian, the contractor that performed the work on building 18, stated that its work crew used the following method with great success. First, they washed part of the building with hot pressurized water, then they applied Sure Klean. After waiting for an effective period of time, which varied depending on the weather conditions, from one hour in hot weather to several days in cold weather, they rinsed off the Sure Klean with pressurized hot water. On cold days two or three applications of Sure Klean were sometimes necessary. The affidavit specifically stated:

> The waiting time that was necessary to allow Sure Klean gel to be most effective is known as dwell time.... The correct dwell time is a very important factor in the removal process. If the remover is allowed to dry on the wall, it forms a new chemical substance which is far more difficult to remove than the original Renuit paint system.

In addition, the affidavit describes Clean–It's work methods and contrasts them with the work methods of Universal's crew:

> I had at least 3 people on the job at all times. This was absolutely necessary in order to complete the job safely and effectively.... Universal ... was doing the same work on adjacent buildings and I was able to observe their work habits. In the Fall of 1982, Universal only worked on the contract for about 10 to 14 days. However, in that time period, they worked the equivalent of about a 30 hour week. Their work was very messy and generally incompetent, and they were unable to effectively remove the Renuit Paint.... The workers employed by Universal that summer, during the time we were on this project, were for the most part, very ineffective. First, they did not clean the surface area to which the Sure Klean gel was applied. Also, they had no sense what the correct dwell

time should be, often hosing off the Sure Klean gel before it had a chance to be effective. Moreover, when they attempted to remove the Sure Klean gel, they insufficiently hosed off the buildings, which made their efforts even less successful. Overall, there was no sophistication to their system.

Finally, the affidavit states that Clean–It "found the contract specifications to be quite clear," and that "the Renuit paint system could be removed when proper techniques were employed." Clean–It's affidavit clearly indicates, contrary to plaintiff's contentions, that at least one other contractor besides Universal encountered Renuit on the buildings.

Universal submitted excerpts from the depositions of its employees, to support its contention that its workers encountered materials on the buildings different from those encountered by the other three contractors. Daniel Tronco (D. Tronco) served as Universal's foreman on the VAMC job from about May 31, 1983 until about August 5, 1983, and James Pumphrey (Pumphrey) served as Universal's foreman on the VAMC job from about August 22, 1983 until about November 25, 1983. Pumphrey made the following comments in his deposition regarding the problems encountered on the VAMC job:

> Paint stripping is fairly easy. You put the chemical on and you wash it down; 99 percent of it is gone. You might have to touch a spot here or a spot there, you know like under the window sill it gets heavier from the drippings and all. This stuff you had to go over and over and over and it wouldn't move. The paint came off the first time, then you had to go back on the wall and keep putting chemicals back on, scrubbing, scraping, wire brushing. You had to do that five or six times.

> . . . . .

> I had two men cleaning [the building] at the same time because they would have to clean it sometimes 8 to 12 times, one drop. The width of a scaffold is one drop. They would have to go over it 8 or 10 times and it still wasn't a hundred

percent clean because the little fibers wouldn't come off.

When Pumphrey was asked at his deposition whether "the other contractors you could see were employing the same process," Pumphrey responded, "Yes, but they didn't have the fibers on the wall." When asked if he recalled having any conversations with any of the other contractors at the VA hospital as to what methods or formulas they might have applied to the buildings, Pumphrey responded that he never talked to the other contractors but he watched them. He described his observations as follows:

> What they did is, they put it on and washed it down and they were done with it, but there was none of this fiber stuff on the brick when they got done either, like I had on building 15 and all. Their bricks were clean when they got done. It was the same [cleaning] material. They would put it on and wash it down and it was done. They didn't have whatever that stuff was on the building I was doing. It was different.

Although both of Universal's foremen deny watering down any of the chemical removers, one of their laborers, Paul C. Turner (Turner), claims that the remover was thinned while he worked on the VAMC job. The parties agree that Turner was employed by Universal to work on the VAMC job from June 20, 1983 until late 1983, and that John C. Casablanca (Casablanca) was employed by Universal to work on the VAMC job from June 20, 1983 through August 18, 1983. In their affidavits, both Turner and Casablanca admit that they had no prior experience with the type of work required on the VAMC job when they were hired by the foreman, D. Tronco. Turner stated that it was evident to him that D. Tronco "did not know what he was doing" on the contract.

In his affidavit, Turner made the following statements about the working conditions during his employment on the VAMC job:

> Daniel Tronco acted only as a supervisor, as John Casablanca and I did the removal work. This was a very difficult job for

only two people to complete. However, it was not long before Daniel Tronco's lack of enthusiasm for the job began to have an effect on us: as the summer progressed our motivation decreased. When Daniel Tronco was not present, our work was even less effective. When it was known that he would be gone for long periods, we would occasionally take extended breaks or leave early. There was no motive for us to work particularly hard as we were salaried employees.

. . . . .

There were many factors contributing to the delay in the completion of the contract. These factors included Daniel Tronco's ineffective leadership, overall lack of experience, lack of sufficient manpower, and lack of motivation. Another factor that might have added to this problem was the fact that the chemical remover was watered down. In sum, as one who worked on the contract the longest, I can assuredly state that with more experienced leadership, and a larger work force, this contract could have been completed much sooner.

Defendant has moved for summary judgment on all four counts in plaintiff's complaint, on the ground that there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law. Count I alleges cardinal changes to the contract, count II alleges defective specifications, count III alleges differing site conditions, and count IV alleges the government failed to disclose superior knowledge. Plaintiff opposes defendant's motion and has cross-moved for partial summary judgment on count III, differing site conditions, on the ground that there is no genuine issue as to any material fact and plaintiff is entitled to judgment as a matter of law. A hearing on these motions was held on March 15, 1990.

### DISCUSSION

This case is before the court on defendant's motion for summary judgment on all four counts in plaintiff's complaint. Therefore, the court must view inferences drawn from the facts "in the light most favorable to the party opposing the motion," in this case, Universal. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *see also D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1146 (Fed.Cir.1983); *Udis v. United States,* 7 Cl.Ct. 379, 383 (1985); RUSCC 56(c).

### A. *Cardinal Changes*

■ Count I of Universal's complaint alleges that the removal of asbestos and glue from the exterior walls of the buildings constitutes a cardinal change to the contract which plaintiff did not anticipate.

Universal contends that, although the contract indicates that the buildings had been treated with a Renuit paint system, the contract failed to indicate that Universal might encounter a fibrous material or any material other than paint, during contract performance. Universal maintains that the fibrous material it encountered on the buildings consisted of glue and asbestos, and that such material differed radically from paint, as to its chemical contents as well as its physical properties.[6] Universal also disputes defendant's contention that the buildings were treated only with Renuit.

The government maintains that the contract specifications clearly state that the buildings had been treated with a "Renuit paint system," and a reasonable interpretation of these specifications is that the job entailed removal of Renuit from the exterior brick walls of the buildings. Defendant argues that Universal had the opportunity to inspect the buildings and determine for itself the nature of Renuit and the amount of work involved in its removal. Defendant maintains that plaintiff's interpretation of the contract specifications as requiring the removal of "paint" is unreasonable, because it reads the words "Renuit" and "system" out of the contract.[7]

---

**6.** According to *Webster's New International Dictionary* (2d ed. 1941—unabridged), the definition of "paint" includes "a mixture of a pigment with some suitable liquid, such as a drying oil, a varnish, or a water dispersion of *glue,* casein, etc., forming a solid adherent covering when spread on a surface in thin coats for decoration, protection, or both." (emphasis added).

Universal's contract contains a standard government contract "changes" clause which permits the government to make changes "within the general scope of the contract." This court, and its predecessor the Court of Claims, have consistently ruled "that such a 'changes' provision does not authorize a 'cardinal' change—a drastic modification beyond the scope of the contract." *Air–A–Plane Corp. v. United States*, 187 Ct.Cl. 269, 275, 408 F.2d 1030, 1032–33 (1969) (and cases cited therein); *Bromley Contracting Co., Inc. v. United States*, 15 Cl.Ct. 100, 108 (1988).

The court in *Air–A–Plane* explained that the "basic standard" for cardinal changes "is whether the modified job 'was essentially the same work as the parties bargained for when the contract was awarded.'" *Air–A–Plane, supra*, 187 Ct.Cl. at 275, 408 F.2d at 1033 (quoting *Aragona Constr. Co. v. United States*, 165 Ct.Cl. 382, 391 (1964)). Moreover, the court warned that the problem of determining whether a change is cardinal " 'is a matter of degree varying from one contract to another' and can be resolved only 'by considering the totality of the change and this requires recourse to its magnitude as well as its quality.'" *Air–A–Plane, supra*, 187 Ct.Cl. at 276, 408 F.2d at 1033 (quoting *P.L. Saddler v. United States*, 152 Ct.Cl. 557, 561, 564, 287 F.2d 411, 413–15 (1961)). *Compare General Contracting & Constr. Co., Inc. v. United States*, 84 Ct.Cl. 570 (1937) (elimination of entire building from construction contract is cardinal change) *with F.H. McGraw & Co. v. United States*, 131 Ct.Cl. 501, 130 F.Supp. 394 (1955) (extensive modifications on three buildings not cardinal change).

Although the government argues that Universal's cardinal changes claim is solely a matter of contract interpretation which is a question of law, the pleadings and other materials before the court indicate the presence of factual disputes in this claim. Indeed, case law makes clear that the

court's inquiry regarding whether there has been a cardinal change to a contract depends on the facts and circumstances of each case. The Court of Claims stated the general rule regarding the government's liability to a contractor as follows:

> In its role as a party to a business contract, the United States is subject to the same liability that—and is not subject to any greater liability than—any other person would be under similar circumstances.... [T]he fact that a person who has contracted with the Government to furnish materials or services encounters unforeseen difficulties, and thereby incurs unexpected expenses, in the performance of the contract does not impose upon the Government any legal obligation to relieve its contractor of the unexpected financial burden.

*Rolin v. United States*, 142 Ct.Cl. 73, 80–81, 160 F.Supp. 264, 268 (1958) (citing *Columbus Ry. Power & Light Co. v. City of Columbus, Ohio*, 249 U.S. 399, 412, 39 S.Ct. 349, 353, 63 L.Ed. 669 (1919); *Industrial Eng'g Co. v. United States*, 92 Ct.Cl. 54, 60 (1940)).

In *Rolin*, the Court of Claims held that the contractor could not recover for his unexpected and greater expenditures of time and money in achieving the necessary dimensional stability in a particular piece of metal, because the government was not responsible in any way for the contractor's difficulties. Moreover, the parameters of the government's liability for changes to a contract are clearly illustrated in the following two cases. In *General Contracting, supra*, 84 Ct.Cl. at 580, the Court of Claims held that the elimination of an entire building from a construction contract was a cardinal change, but in *F.H. McGraw, supra*, 131 Ct.Cl. at 506, 130 F.Supp. at 397, extensive modifications on three buildings was not a cardinal change.

These cases clearly indicate that the court must view the contract as a whole in determining whether there has been a cardinal change, which may include a determi-

---

7. As noted in *Deuterium Corporation v. United States*, 19 Cl.Ct. 624, 629 n. 9 (1990), according to *Webster's New Collegiate Dictionary* (1975),

"system" means, among other things, "1: a regularly interacting or interdependent group of items forming a unified whole."

nation of whether the contractor's difficulties in performance were precipitated in any way by the government's conduct.

In its brief, Universal identifies at least two material factual disputes concerning its cardinal changes claim. The first dispute is whether the glue and asbestos material differed radically from paint, and the second is whether the buildings were treated only with Renuit. These disputed issues require further ventilation.

As the moving party, defendant has failed to carry its initial burden of demonstrating to the court that no genuine issues of material fact exist, and that it is entitled to summary judgment as a matter of law. *See Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1165 (Fed.Cir.1985); *Udis, supra,* 7 Cl.Ct. at 383. Therefore, defendant's motion for summary judgment on Universal's cardinal changes claim is denied.

### B. *Defective Specifications*

■ Count II of Universal's complaint alleges that the contract specifications were defective regarding the method of removing Renuit. Plaintiff contends that these were design specifications, and that defendant breached its implied warranty that compliance with these specifications would result in contract performance. Defendant concedes, for the purpose of its summary judgment motion, that the specifications were of the design type.

The general rule with regard to the government's liability for defective specifications is that, if the specifications are strictly observed, the government implicitly warrants that satisfactory performance will result. *See United States v. Spearin,* 243 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918); *Haehn Management Co. v. United States,* 15 Cl.Ct. 50, 56 (1988), *aff'd,* 878 F.2d 1445 (Fed.Cir.1989); *Utility Contractors, Inc. v. United States,* 8 Cl.Ct. 42, 49 (1985), *aff'd,* 709 F.2d 90 (Fed.Cir.1986), *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 53 (1986). The government's liability only arises, however, if the court finds the specifications to be of the design type, rather than the performance type. In *Utility Contractors* the court explained the

difference between design and performance specifications:

> [P]erformance type specifications set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance.... Design specifications are explicit, unquestionable specifications which tell the contractor exactly how the contract is to be performed and no deviation therefrom is possible.

*Utility Contractors, supra,* 8 Cl.Ct. at 49, 51 (quoting *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 689, 412 F.2d 1360, 1362 (1969)). Moreover, the Claims Court has defined design specifications more precisely by stating that "[s]pecifications are design when 'only one material or a certain composition will enable the product to meet the performance standards expressed in the specification.' " *GAF Corp. v. United States,* 19 Cl.Ct. 490, 500 n. 2 (1990) (quoting *Johns–Manville Corp. v. United States,* 13 Cl.Ct. 72, 131 (1987), *vacated on other grounds,* 855 F.2d 1571 (Fed.Cir. 1988)).

The contract in this case appears to contain elements of both design and performance specifications. On the one hand, the contract specifies name brands of chemical removers, but it also allows the contractor to propose the use of another brand if it is "the equal" of the brands specified, with the limitation that the main chemical compound of the "equal" brand the chemical remover that the VA allowed Merritt–Meridian to use, under the same contract specifications as Universal's, did not contain methylene chloride as its main chemical compound.

In support of its contention that these were design specifications, Universal argues that it was allowed no discretion to deviate from the specifications in the rinsing process, except to vary the water pressure between 300 and 500 PSI. However, Universal ignores the fact that the VA's conduct, as well as the specifications themselves, gave all the contractors a significant amount of discretion in performing the contracts. For example, Universal's

and Merritt–Meridian's contract specifications presumably allowed variations in the rinse water temperature, since no water temperature was prescribed in the contract, and indeed Merritt–Meridian raised the water temperature with successful results. The contract specifications also required the contractors to conduct experimental tests on the chemical removers to determine the correct "dwell time" for the most efficient cleaning results. In fact, the testimony of the other contractors indicates that the correct "dwell time" was very important to obtain successful results. The testimony of plaintiff's employees suggests, however, that Universal's crew did not comprehend the importance of the "dwell time" factor.

For these reasons Universal's contract specifications may resemble more closely performance than design specifications, since plaintiff was vested with a great deal of the " 'responsibility for the means and methods selected to achieve the end reslt.' " *Utility Contractors, supra,* 8 Cl.Ct. at 51 (quoting *J.L. Simmons, supra,* 188 Ct.Cl. at 689, 412 F.2d at 1362). Furthermore, in *Utility Contractors,* the court held that, where a contract contains both design and performance specifications, but the contract specifications, when read as a whole, permit the contractor "to use his own judgment and experience in deciding how, when, where [and] under what conditions" the project will be carried out, the specifications will be considered as the "performance" type. *Utility contractors, supra,* 8 Cl.Ct. at 50–51. In this regard, it is not without significance that the contract specifications under "Work Procedure" admonished that "work shall be accomplished by skilled tradesmen, under the direction of a competent and responsible foreman."

However, assuming, as defendant does, for summary judgment purposes, that these are design specifications, the primary issue is whether Universal could have successfully removed the Renuit by following the specifications contained in its contract. Defendant argues that, even if the specifications are design specifications, they are not defective because another contractor, Merritt–Meridian, was able to successfully complete the contract by following the same specifications.[8] Universal counters by pointing out Merritt–Meridian's alleged deviation from the contract specifications by its use of hot water at higher pressures than the specifications indicate. Moreover, plaintiff emphasizes the fact that the VA approved an amendment to Universal's contract in September of 1983 to conform to the contract specifications of the two contractors CW and Ganem, whose contract specifications call for the use of a hot water rinse at a pressure of 1200 PSI. The CW and Ganem contracts also specify the use of Sure Klean, rather than Sears or Formby's, as the brand-name chemical remover. The VA's resident engineer suggested to Universal in June of 1983 that Universal try Sure Klean, which Universal did, albeit with less than successful results. Finally, Universal disputes defendant's contention that Merritt–Meridian's building was covered with the same material as Universal's buildings.

As the above discussion indicates, there are several material factual disputes with regard to plaintiff's defective specifications claim that cannot be resolved on a motion for summary judgment, but rather are best left for trial. The issue of whether the contract contained predominantly design or performance specifications requires some inquiry into the VA's conduct, which may have allowed greater deviation from the specifications than a plain reading of the contract would suggest.[9] Furthermore, if

---

8. The Court of Claims has held in the past that performance of the same type of contract, by another contractor, in compliance with substantially identical specifications is persuasive evidence that the contract was not impossible to perform. See *Astro–Space Labs., Inc. v. United States,* 200 Ct.Cl. 282, 299–300, 470 F.2d 1003, 1013 (1972); *Astronautics Corp. v. United States,* 193 Ct.Cl. 910, 922, 436 F.2d 430, 437 (1971).

9. It is significant to note that the government's conduct, as the record reflects, indicates that strict adherence to the specifications was not required of the contractors. The government's apparent goal was to remove the exterior materials from the VAMC buildings without damaging the bricks. The government allowed Universal to experiment with several brands of chemical removers, even those without methy-

the court finds that the specifications more closely resemble the design type, then further inquiry is needed regarding whether the specifications are defective, which would in turn involve a determination of whether Universal's crew performed competently, and whether any other contractor followed the same specifications, on buildings covered with the same material, with successful results.

For these reasons, defendant's motion for summary judgment on count II of plaintiff's complaint is denied.

### C. *Differing Site Conditions*

■ Count III of Universal's complaint alleges that, in performing the contract, Universal encountered the presence of asbestos on the exterior walls of the buildings, which constitutes a differing site condition under the terms of the contract, and that this condition was not discoverable through a reasonable site inspection. In response to defendant's motion for summary judgment, plaintiff has cross-moved for summary judgment on this claim, contending that there are no material factual disputes.

Universal's contract contains a standard "differing site conditions" clause, which states, in pertinent part:

(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of:

(1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract.

Plaintiff claims the presence of asbestos on the buildings satisfies the elements of either Category I or Category II differing site conditions. With regard to Category I, Universal argues that the contract documents indicate that Universal would be required to chemically remove paint, not asbestos, in performing the contract, and that the contract gave no indication that such a "latent physical condition" as asbestos would be encountered beneath the layers of paint. Plaintiff contends that the site conditions, as indicated at several places in the contract documents, gave rise to a permissible inference that Universal would only encounter paint during contract performance. With regard to Category II, Universal argues that asbestos is not a material ordinarily encountered in "paint removal" contracts, and that no other contractor at the VAMC encountered this type of material.

In support of its motion for summary judgment, the government argues that Universal is not entitled to recover on either a Category I or II differing site conditions claim as a matter of law. As to Category I, defendant argues that the contract did not specify the nature of the subsurface material, other than stating that a "Renuit paint system" is present, and therefore, without any indications in the contract whatsoever, plaintiff's argument that the glue and asbestos constitutes "subsurface or latent conditions differing materially from those indicated in the contract" must fail. Furthermore, defendant argues that a reasonable and prudent contractor would have read the contract documents to clearly indicate the "paint removal requirements." Defendant correctly points out that the bidders, including Universal, were encouraged to conduct pre-bid building inspections. As to Category II, defendant

lene chloride, contrary to the requirements in the contract specifications. The government permitted the other contractors to deviate from the specifications as well.

When interpreting contracts, the Supreme Court observed that "[t]here is no surer way to find out what parties meant, than to see what they have done." *Insurance Co. v. Dutcher*, 95 U.S. 269, 273, 24 L.Ed. 410 (1877). *See also Cresswell v. United States*, 146 Ct.Cl. 119, 127,

173 F.Supp. 805, 811 (1959) (if one party knows or has reason to know what other party intended, he is bound by that meaning); *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed.Cir.1983), *cert. denied*, 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983) (contract must be interpreted in accordance with parties' understanding as shown by their conduct before the controversy).

argues that plaintiff cannot show that it has encountered something materially different from the "known" and "usual," since the contract did not represent the subsurface conditions at all. Defendant maintains that the buildings were covered with exactly what the contract stated they were covered with—a Renuit paint system.

Defendant concludes that, in any event, information regarding the contents of Renuit, was not material to the performance of the contract, since three other contractors successfully removed Renuit from the buildings.

In order to prevail on a Category I differing site conditions claim, "plaintiff must prove that it encountered subsurface or latent physical conditions at the site materially different from site conditions 'indicated' in the contract, ... that these conditions were reasonably unforeseeable by the contractor," and the " 'indications' need not be explicit, but rather, they may be proven by inferences and implications in the contract documents." *J.F. Shea Co., Inc. v. United States*, 4 Cl.Ct. 46, 51 (1983). To determine whether Universal encountered materially different site conditions from those indicated in the contract, the court must "place itself 'into the shoes of a "reasonable and prudent" contractor.' " *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 917 (Fed.Cir.1984) (quoting *H.N. Bailey & Assoc. v. United States*, 196 Ct.Cl. 156, 163, 449 F.2d 387, 390 (1971)). Although the Federal Circuit recognized in *P.J. Maffei, supra*, that the interpretation of a contract is a matter of law, the differing site conditions claim also raises factual issues. The parties do not agree as to whether Universal encountered only Renuit or some additional material in performing the contract. Although the parties apparently agree that Renuit is not a paint, this is a matter that may, on trial, be proven technically incorrect since the assertion that Renuit was not a paint seems, on this record, to be advertising hyperbole. The parties also dispute wheth-

er Renuit is materially different from substances usually encountered in a contract of this type.[10] Finally, the parties disagree on whether the other three contractors performed work on buildings treated with the same materials, and in the same amounts, as the buildings on which Universal worked. These material factual disputes preclude the resolution of this claim by summary judgment. Therefore, the parties' cross-motions for summary judgment on the differing site conditions claim are denied.

### D.  *Superior Knowledge*

█ Count IV of Universal's complaint alleges that the government breached its implied duty of cooperation by failing to disclose superior knowledge regarding the asbestos content and other characteristics of Renuit.

Universal correctly points out that the government admitted during discovery that Renuit is not a paint. However, the government refused to admit during discovery that Renuit contains asbestos, although the government subsequently submitted to the court evidence of a letter from the manufacturer of Renuit to the VA stating that Renuit contains asbestos.

Universal contends, however, that the government knew Renuit contained asbestos prior to award of Universal's contract. Indeed, the government submitted the affidavit of the VA's Chief of Engineering Service, Kajor, who stated that he received information from a laboratory by telephone in 1982 that Renuit contained asbestos. Universal contends that this information was vital to its performance of the contract, and it could not obtain this information on its own because Renuit's manufacturer refused to disclose its contents until several years after the contract was completed.

The government contends that there is no evidence that it knew the exact chemical composition of Renuit at the time it award-

---

10.  Plaintiff stresses the fact that defendant acknowledged in response to a request for "Admissions," that Renuit Exterior Wall Resurfacer (REWR) is not a paint. Plaintiff also stresses the fact that manufacturer literature boasts that REWR is substantially thicker than paint and is equal in thickness to more than ten coats of paint.

ed Universal's contract, and furthermore, Universal had equal access to whatever information was available concerning Renuit. Moreover, the government maintains that, had Universal performed the contract with proper removal methods, Universal would not have encountered problems removing Renuit, and therefore any information concerning the contents of Renuit was not vital to successful contract performance.

It is well-settled in this court that the government's liability to disclose information arises when:

a contractor (1) undertakes to perform without vital knowledge of a fact that affects performance costs or [duration], (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*GAF, supra,* 19 Cl.Ct. at 484 (quoting *Lopez v. A.C. & S., Inc.,* 858 F.2d 712, 717 (Fed.Cir.1988)). *See also Hardeman–Monier–Hutcherson v. United States,* 198 Ct.Cl. 472, 487, 458 F.2d 1364, 1370 (1972); *Max Jordan Baunnternehmung v. United States,* 10 Cl.Ct. 672, 678 (1986), *aff'd,* 820 F.2d 1208 (Fed.Cir.1987); *J.F. Shea, supra,* 4 Cl.Ct. at 53.

The court's determination of whether the government has breached its duty to disclose information in this case is a question of law, but such legal analysis requires the court to make certain factual findings. After careful review of the parties' briefs and after hearing the parties' oral arguments it is clear to the court that there are material factual disputes regarding this claim which cannot be resolved by summary judgment. The parties disagree over whether, and what, the government knew about the asbestos content of Renuit at the time of the contract award, whether Universal had equal access to such information, and whether Universal's crew performed the contract competently.

For these reasons, defendant's motion for summary judgment on plaintiff's superior knowledge claim is denied.

CONCLUSION

Summary judgment is inappropriate when the parties have failed to show the absence of dispute on issues of material fact. *Balboa, supra,* 775 F.2d at 1165. As the foregoing discussion indicates, there are several factual disputes involving all four counts in plaintiff's complaint. Therefore, the government's motion for summary judgment on counts I, II, III, and IV in plaintiff's complaint must be DENIED. For the same reason, plaintiff's cross-motion for partial summary judgment on its differing site conditions claim (Count III) is also DENIED. The parties are directed to confer and reach agreement on a procedural schedule looking to trial in the immediate future of this case. This schedule should include, *inter alia,* when discovery shall be deemed completed, when witness lists and document lists shall be exchanged; the setting of a date and place for trial. Further, the parties shall be required to prepare and submit to the court prior to trial proposed findings of fact and briefs on all the issues. The schedule called for by this order shall be filed with the court within thirty (30) days of the date of this order, or by April 25, 1990.