**J.F. SHEA COMPANY, INC.**

v.

**The UNITED STATES.**

No. 224–82C.

United States Claims Court.

Nov. 30, 1983.

**48**

David P. Yaffe, Los Angeles, Cal., for plaintiff; D. Michael Schoenfeld and Monteleone & McCrory, Los Angeles, Cal., of counsel.

Robert G. Giertz, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

MEROW, Judge:

This construction contract case comes before the court on defendant's motion for summary judgment, plaintiff's opposition to summary judgment, and defendant's reply.[1]

---

1. Although counsel requested an oral argument, upon a review of the extensive materials filed and the briefs submitted by counsel, it was concluded that an argument was not required at this time. This approach was also indicated by the prompt need to determine

## Nature of the Case

In this action plaintiff alleges that during performance of its construction contract with the Department of Interior, Bureau of Reclamation, in which plaintiff was required to build a 7.34-mile aqueduct at a lump sum cost of $25,696,320, it encountered a differing site condition within the meaning of the Differing Site Condition clause contained in Article 4(a)(1) of the General Provisions of the contract.[2] Plaintiff contends that subsurface conditions it encountered differed materially from "indications" in the contract, causing plaintiff to install more steel rib supports in the aqueduct than the amount originally anticipated, which resulted in plaintiff incurring additional expenses of $5,614,962. Plaintiff also asserts a "superior knowledge" claim, by alleging that defendant concealed material facts vital to plaintiff's performance under the contract such that the government breached its contract with plaintiff. Lastly, plaintiff maintains that its claim for damages has been properly certified in accordance with 41 U.S.C. § 605(c)(1), although plaintiff's claim has been increased by $1,674,735 (from $3,940,227 to $5,614,962) since it was first certified and submitted to the contracting officer in accordance with 41 U.S.C. § 605(a).

Defendant, on the other hand, maintains that summary judgment should be granted because the subsurface conditions Shea encountered did not materially differ from all "indications" in the contract documents.

Defendant also contends that it disclosed all material facts in its possession to plaintiff (and to all other bidders) and that its nondisclosure of opinions, inferences, and subjective conclusions flowing from disclosed facts is not actionable as a breach of contract by defendant. Lastly, defendant insists that the court lacks jurisdiction in this action because the total amount of plaintiff's claim has not been properly submitted and certified to the contracting officer in accordance with 41 U.S.C. § 605.

## Factual Background

Defendant solicited bids in 1975 for the construction of a 7.34-mile aqueduct known as "Vat Tunnel, Strawberry Aqueduct, Bonneville Unit, Central Utah Project" (Vat Tunnel). Plaintiff, J.F. Shea Co., submitted the lowest bid price of $25,696,320 and was awarded the contract on August 29, 1975. The solicitation issued by defendant contained two bidding schedules. Schedule I, on which Shea did not bid, required that proposals be submitted on a "unit price" basis. Estimated quantities of 2,190,000 pounds of steel rib supports and 140,000 linear feet of rock bolt support were set forth in Schedule I and bidders were requested to propose a unit price for each support based on the stated quantities. The "Quantities and Prices" clause of the Special Provisions of the solicitation[3] informed bidders that the estimated quantities would be used for bid comparison purposes only. If additional supports above

---

whether evidentiary proceedings are required so as to avoid delay in the ultimate resolution of this complex case.

2. The Differing Site Conditions clause reads in pertinent part:

"(a) The Contractor shall promptly * * * notify the Contracting Officer in writing of: (1) Subsurface or latent physical conditions at the site differing materially from those indicated in [the] contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the Contractor's cost of,

or the time required for, performance of any part of the work under [the] contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made * * *."

3. The "Quantities and Prices" clause of the Special Provisions reads in pertinent part:

"a. General.—The quantities stated in the schedule are estimated quantities for comparison of bids * * * no claim shall be made against the Government for excess or deficiency therein. Payment at the unit or lump-sum prices agreed upon will be in full for the completed work and will cover materials, supplies, transportation, labor, tools, machinery, and all expenditures incident to satisfactory compliance with the contract, unless otherwise specifically provided."

the amount required by the drawings became necessary during contract performance, the contracting officer's approval was required "for the quantities which, in the judgment of the contracting officer, are necessary for satisfactory construction."

Schedule II, on which Shea did bid, called for proposals on a "linear foot" basis irrespective of the type, amount or frequency of support (either rock bolts or steel rib supports) which the contractor planned to utilize in constructing the tunnel. Schedule II set forth the number of linear feet (38,-760) of the proposed 7.34-mile aqueduct and bidders were instructed to propose a lump sum for the entire construction of Vat Tunnel.

Although Shea bid on Schedule II, it asserts it relied on the estimates of steel rib supports contained in Schedule I in preparing its bid. Thus, Shea maintains that the Schedule I bidding information applies to its contract. Shea further asserts that the estimates in Schedule I were confirmed by other "indications" in the contract such as boring logs showing subsurface conditions consistent with the bidding schedule estimates, and specification requirements in the contract indicating that 50 percent of Vat Tunnel could be supported by rock bolts and, therefore, 50 percent of the tunnel did not require steel rib supports, contrary to the subsurface conditions plaintiff encountered. Plaintiff also insists that the contract documents, as a whole, including a report entitled "1972 Preconstruction Geology Report of the Vat Tunnel Line (G–279)" prepared by the Department of the Interior and provided to bidders for their perusal, further corroborated the accuracy of bidding schedule estimates. Plaintiff contends that the lack of a divided bid item[4] in Schedules I and II and the inclusion of one

in Schedule III is a further "indication" that the subsurface conditions plaintiff would encounter, and the steel rib support needs of Vat Tunnel, would closely resemble the government's bidding estimates contained in Schedule I. Lastly, plaintiff asserts that it performed its own pre-bid site investigation of the geologic conditions and, furthermore, that plaintiff engaged a consulting firm to perform two inspections of the subsurface geology at the tunnel site. It is asserted that the results of all on-site investigations only confirmed the accuracy of the government bidding estimates in Schedule I. Although the plaintiff has alleged numerous indications in the contract documents consistent with the government's estimated quantity of steel rib supports of 2,190,000 pounds, plaintiff found it necessary to install 4,260,861 pounds of steel rib supports during actual construction.

### *Discussion*

■ The purpose served by the Differing Site Conditions clause in a construction contract, which permits a contractor to seek an equitable adjustment in the contract price for a changed condition, is to prevent bidders from increasing their bid prices to protect against misfortunes resulting from unforeseen developments, *Chernus v. United States,* 110 Ct.Cl. 264, 267, 75 F.Supp. 1018, 1019 (1948), and thus avoid turning a construction contract into a "gambling transaction." *Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 517, 522–23, 74 F.Supp. 165, 168 (1947).

■ There are two types of changed conditions which can form the predicate for recovery under the Differing Site Conditions clause of a contract. Type I, under which plaintiff's claims fall, requires that

---

4. Plaintiff insists that the government provides for a "divided bid item" when it is uncertain about its own estimated quantities. Conversely, the government does not provide for a "divided bid item" when it believes that the quantities needed to perform the work will not vary substantially from those set forth in the contract schedule. The plaintiff points to provisions of the "Quantities and Prices" clause to confirm this observation. The clause reads in

pertinent part: "b. Divided items.—Because the quantity of work actually required for open-cut excavation in Schedule No. 3 may vary widely from the quantity listed therefor in the schedule, the total estimated quantity of this item has been divided into two ranges, as shown on the schedule." In the instant case, the government provided for a divided bid for those contractors who bid on Schedule III, not on Schedules I or II.

subsurface or latent physical conditions at the site differ materially from those indicated in the contract, *Foster Construction Co. v. United States,* 193 Ct.Cl. 587, 594, 435 F.2d 873, 876 (1970), and that these conditions be reasonably unforeseeable by the contractor. *Mojave Enterprises v. United States,* 3 Cl.Ct. 353, 357 (1983). A Type II condition consists of unknown and unusual physical conditions at the site, differing materially from those ordinarily encountered and generally recognized as inhering in the work provided for in the contract. *Foster Construction,* 193 Ct.Cl. at 594–95, 435 F.2d 873.

■ Plaintiff asserts only a Type I changed condition. To prevail, plaintiff must prove that it encountered subsurface or latent physical conditions at the site materially different from site conditions "indicated" in the contract. *Lord Brothers Contractors,* IBCA No. 125, 59–1 BCA ¶ 2069 at 8746. The "indications" need not be explicit, but rather, they may be proven by inferences and implications in the contract documents. *Foster Construction,* 193 Ct.Cl. at 604, 435 F.2d 873. The plaintiff need not prove a deliberate or negligent misrepresentation made by the the government in the contract documents. *Id.* at 602, 435 F.2d 873. Rather, plaintiff's burden of proof would be carried if it shows a material variation between the subsurface conditions stated in the contract and those conditions encountered at the job site. *Id.* at 602–03, 435 F.2d 873.

Plaintiff has asserted that it properly relied on bidding schedule estimates as indicative of subsurface conditions it could expect to encounter. Defendant maintains, however, that estimates in a bidding schedule cannot legally serve as contract "indications." In *American Shipbuilding Co. v. United States,* 228 Ct.Cl. 220, 654 F.2d 75 (1981), the Court of Claims ruled that a delivery schedule contained in bid docu-

ments is not an affirmative representation by the government that a project can be performed within the stated schedule. As no bidder is entitled to rely on such a schedule, the court ruled that a bidder must study the drawing and specifications and assess its own capability to perform the work within the given time periods. *Id.* 654 F.2d at 78. *American Shipbuilding* did not hold that a bidder is precluded from relying on information in the bidding schedule when the claim at issue arises under the Differing Site Conditions clause, which requires proof of a contract "indication," not of an affirmative warranty or representation by the government. Thus, *American Shipbuilding* does not support the award of summary judgment as a matter of law at this juncture on a differing site conditions claim.

■ Bidding schedules can have legal significance as contract "indications" in the absence of express contract provisions disclaiming their significance. *Lord Brothers Contractors,* ¶ 2069 at 8749; *Guy Atkinson Co.,* IBCA No. 385, 65–1 BCA ¶ 4642 at 22,176, n. 16. In the instant case, plaintiff's reliance on the bidding schedule estimates must be viewed against the government's express disclaimer of such estimates in the "Quantities and Prices" (approximate quantities) clause of the contract. This clause informed the bidder that bidding estimates provided in Schedule I were solely for bid comparison purposes. If an approximate quantities clause and its accompanying disclaimer were given full effect, a bidder would be precluded from relying on the bidding schedule estimates as a predicate for assertion of a changed conditions claim. Under such circumstances, estimates in the bidding schedule could not legally be "indications" in the contract documents which would support a claim for a Type I changed condition. *Guy Atkinson Co.,* ¶ 4642, at 22,-174.[5]

---

5. What falls within the ambit of the term "indications" in a contract document is a matter of contract interpretation and, thus, a matter of law for the court to decide. *Mojave Enterprises v. United States,* 3 Cl.Ct. 353, 357 (1983).

Unlike the situation in *Mojave Enterprises,* however, the present claim does not come before the court on the basis of judicial review of a full evidentiary record of an administrative board. The instant case is a "direct access"

■ However, this result should not automatically be applied to nullify the legal effect of a bidding schedule estimate. *Continental Drilling Co.,* ENG BCA No. 3455, 75–2 BCA ¶ 11,540 at 55,084–85. *See Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 517, 74 F.Supp. 165 (1947) (estimates in bid documents not rendered meaningless by approximate quantities clause). Rather, all specifications, drawings and other requirements of the contract must be examined to determine the nature of the work to be performed. The weight, if any, to be given to the information set forth in the bidding schedule estimate as an "indication" must depend upon the results obtained from the examination of all information provided or available. If such a study of drawings and specifications and available material indicated the actual situation encountered, a bidder could not rely on erroneous bidding schedule estimates as a contract indication supporting recovery for a Type I changed condition. *Otis Williams and Co.,* IBCA No. 324, 1962 BCA ¶ 3487 at 17,805; *Stock & Grove, Inc. v. United States,* 204 Ct.Cl. 103, 493 F.2d 629 (1974); *Perini Corporation,* ENG BCA No. 3745, 78–1 BCA ¶ 13,191 at 64,521–22 (presence or absence of an approximate quantities clause was not argued).

■ In *Continental Drilling,* ENG BCA No. 3455, 75–2 BCA ¶ 11,540, also a construction contract case, it was ruled that bidding schedule estimates served as "indications" of subsurface conditions and the "Variations In Estimated Quantities" clause of the contract [6] did not automatically preclude a bidder's reliance on those estimates. *Id.* at 55,084. It was concluded that since a contractor would have gained no knowledge of the subsurface conditions from a perusal of the government's boring logs and inspection reports, nor would a pre-bid on-site inspection have produced more accurate information than that contained in the bid-

ding schedule estimates, the disclaimer would not nullify the effect of the estimates. *Id.* at 55,085. *See Green Construction Co.,* ENG BCA No. 3850, 78–2 BCA ¶ 13,497 (contractor relied on bidding schedule estimates which were confirmed by contract drawings and site inspection; no discussion of whether approximate quantities clause accompanied estimate).

In the instant case plaintiff has presented facts which, if proven, would indicate that the contract specifications and drawings confirmed, not disproved, the accuracy of the bidding schedule estimates. Plaintiff maintains that its pre-bid site inspections did not reveal the nature of the subsurface conditions encountered but, instead, served to confirm the government bidding estimates. Thus, plaintiff contends that the true nature of the subsurface conditions was not ascertainable on the basis of all information reasonably available to the contractor at the time of bidding.

In this circumstance, it is concluded that a sufficient showing has been made to preclude summary judgment as a matter of law in favor of defendant and that evidentiary proceedings are required to resolve the question as to the existence of a Type I changed condition.

### Plaintiff's Remaining Claims

### Breach of Contract (Superior Knowledge)

Plaintiff's amended complaint states a second cause of action for breach of contract by the defendant. Plaintiff alleges that the government concealed material facts vital to contract performance. This claim stems from the "1972 Preconstruction Geologic Report of the Vat Tunnel Line (G–279)" which was prepared by the Department of Interior, Bureau of Reclamation, and which was released to all bidders. As established by deposition testimony, this report was based on several prior geology

---

suit brought pursuant to 41 U.S.C. § 609. Hence, all facts relevant to the legal determination must first be assembled.

**6.** The "Variations In Estimated Quantities" clause read in pertinent part: "Variation from

the estimated quantity in the actual work performed under any second or subsequent subitem [in the contract schedule] * * * will not be the basis for an adjustment in contract unit price * * *." *Continental Drilling* at 55,085.

reports prepared by the Department in 1948, 1961 and 1969. Plaintiff maintains that defendant breached the contract by concealing the existence of these prior reports and by concealing the fact that the government had formed opinions, conclusions and estimates, as revealed in these prior reports, about the geologic conditions of Vat Tunnel. Plaintiff insists that the government "sanitized" the 1972 report by failing to include in the report opinions, conclusions and estimates which would have a negative impact on potential bidders. Plaintiff contends that the negative opinions, conclusions and estimates were in fact contained in the 1969 report ("Geology of Vat Tunnel Line, Bonneville Unit (G–266)") whose text furnished the basis for the 1972 report. Plaintiff alleges that it was misled into the belief that the 1972 report represented all the data, opinions, conclusions and estimates which the government had in its possession. This erroneous belief induced total reliance by the plaintiff on the 1972 report which, plaintiff asserts, showed favorable subsurface conditions at Vat Tunnel.

 If the government possesses special knowledge which is vital to the performance of a contract but which is unknown and not reasonably available to a bidder who is thereby misled, the government must disclose its superior knowledge or be held liable for breach of contract. *Hardeman-Monier-Hutcherson v. United States,* 198 Ct.Cl. 472, 487, 458 F.2d 1364, 1370 (1972); *Helene Curtis Industries, Inc. v. United States,* 160 Ct.Cl. 437, 442, 312 F.2d 774, 777 (1963); *Ragonese v. United States,* 128 Ct.Cl. 156, 120 F.Supp. 768 (1954). The government is under no duty to disclose information, such as an opinion or conclusion of its geologist, where the knowledge of both the government and the bidder is based on data equally available to both parties and where more conclusive data is available but neither party chooses to obtain it. *L.G. Everist, Inc. v. United States,* Ct.Cl. No. 571–80C (order entered Sept. 24, 1982). For instance, where the government, in connection with an excavation project, failed to disclose its estimate

of subsurface rock because the estimate was based on boring log data which was released to bidders, it was ruled that there was no breach of contract because the vital information (*i.e.,* the boring logs) necessary to appraise the potential problems and costs associated with contract performance was available. *T.F. Scholes, Inc. v. United States,* 174 Ct.Cl. 1215, 357 F.2d 963, 970 (Ct.Cl.1966). Similarly, in *L.G. Everist, Inc. v. United States,* Ct.Cl. No. 571–80C (order entered Sept. 24, 1982), which involved a contract for the excavation of "riprap" from a quarry, the defendant's geologist expressed tentative reservations about the quality of the "riprap" in light of its intended use. The defendant did not disclose its opinion to plaintiff. The court ruled that both parties could have ascertained the true quality of the "riprap" by "test quarrying" but both parties declined to do such testing. Thus, information about the true quality of the quarry rock was reasonably available to plaintiff and there was no breach by defendant in withholding from plaintiff its opinion on the quality of the rock.

 In the instant case, Shea has maintained that defendant had a superior opportunity to learn of the true geologic conditions at Vat Tunnel because defendant has been studying the area for twenty-five years and this lengthy study is reflected in the 1948, 1961 and 1969 Vat Tunnel reports. Plaintiff insists that nondisclosure of these reports effectively prevented plaintiff from acquiring the true facts about the subsurface conditions at Vat Tunnel.

In *Hardeman-Monier-Hutcherson v. United States,* 198 Ct.Cl. 482, 458 F.2d 1364 (1972), also a construction contract case, the government refused to disclose certain weather and sea reports despite plaintiff's requests to examine them. The plaintiff contended that the reports contained information vital to contract performance and that the information was not reasonably available from either a site inspection or from an examination of other weather data provided to plaintiff. The court ruled that

the defendant had breached the contract by failing to disclose the reports.

In the light of the established precedents and plaintiff's supported assertions concerning superior knowledge on the part of the government concerning the Vat Tunnel conditions, summary judgment cannot be appropriately granted on this issue at the present time as evidentiary proceedings are required.

### Jurisdictional Claim

Plaintiff submitted a certified claim to the contracting officer for an equitable adjustment under the Differing Site Conditions clause in the amount of $3,940,227 on June 23, 1980. By letter dated May 6, 1981 the contracting officer denied plaintiff's claim *in toto*. On May 4, 1982 the plaintiff brought a direct access suit in this court, having elected to proceed under the Contract Disputes Act, 41 U.S.C. § 601 (note), with its post-Act claim stemming from a pre-Act contract. Plaintiff's claim for damages, however, increased by $1,674,735 from $3,940,227, which was submitted to the contracting officer, to $5,614,962 upon filing the complaint in this court. Thus, the total dollar amount of plaintiff's claim has not been certified, 41 U.S.C. § 605(c)(1), nor submitted to the contracting officer for decision pursuant to 41 U.S.C. § 605(a).

Plaintiff accounts for this increased claim by maintaining that it was the result of both a computational error in calculating the original claim of $3,940,227 and the need for adjustment in light of the findings of a Department of Interior audit of the claim.

This court and its predecessor have consistently held that it is a jurisdictional prerequisite to a direct access suit in this court that the claim at issue be first certified and submitted in writing to the contracting officer pursuant to 41 U.S.C. §§ 605(a), 605(c)(1). *Grad Partnership v. United States,* 1 Cl.Ct. 616, 619 (1982); *Skelly and Loy v. United States,* 685 F.2d 414, 417 (Ct.Cl.1982); *W.H. Moseley Co. v. United States,* 677 F.2d 850, 851 (Ct.Cl. 1982). However, as litigation in this court

includes pretrial proceedings, including discovery, it must be recognized that additional facts may be developed which could increase or decrease the amount of a claim. It would be most disruptive of normal litigation procedure if any increase in the amount of a claim based upon matters developed in litigation before the court had to be submitted to the contracting officer before the court could continue to a final resolution on the claim. In this circumstance, it has been ruled that, after certification is complete, a contractor is not precluded from changing the amount of the claim or producing additional data in support of increased damages. *Newell Clothing Co.,* ASBCA No. 24482, 80–2 BCA ¶ 14,774 at 72,916. A plaintiff must be precluded, however, from raising any new *claim* before this court which was not previously presented and certified to the contracting officer for decision. *Aden Music Company,* ASBCA No. 26361, 82–1 BCA ¶ 15,723 at 77,777 (contractor submitted claim for improper convenience termination to contracting officer and raised damages claim only on appeal to board; board was without jurisdiction to hear damages claim). The certification requirement assures that the plaintiff is submitting a claim in an amount it *then* honestly believes is due and that the data furnished *at the time of certification* are accurate and complete to the best of plaintiff's knowledge and belief. *Newell Clothing Co.,* ASBCA No. 24482, 80–2 BCA ¶ 14,774 at 72,916.

In the instant case, the increased amount of Shea's claim which was not submitted to the contracting officer for decision does not represent a new "claim." *Spradlin Corporation,* ASBCA No. 23974, 81–2 BCA ¶ 15,423 at 76,430–31. In *Spradlin Corp.* the plaintiff-contractor submitted a certified claim for an equitable adjustment of $44,032 under the Differing Site Conditions clause of a construction contract awarded by the Department of the Army. Plaintiff alleged that, due to defective contract drawings, it had to perform an additional two feet of excavation causing plaintiff additional costs in "digging, parging and

waterproofing." In its action before the board, plaintiff amended its complaint to include all items of damages due to the allegedly defective drawings. The board held that it would not have jurisdiction over all damages flowing from the defective drawings. Rather, the board would assert jurisdiction only over additional items of damages relating to plaintiff-appellant's basic claim, *i.e.,* that defective drawings created the need for additional excavation. Thus, there was no bar to the board's jurisdiction over increased damages flowing from the same factual claim which had been submitted and certified to the contracting officer. *Spradlin Corp.* at 76,429.

In the instant case, Shea has not presented a *new* claim. Rather, the factual basis of the claim before this court is identical to the claim which was certified to the contracting officer on June 23, 1980. Shea has merely presented additional evidence pertaining to damages springing from that same factual claim. Thus, there is no jurisdictional bar to considering the increased claim, *Spradlin Corp.* at 76,431, and hence, no need, as suggested by defendant, to dismiss plaintiff's claim without prejudice to permit resubmission of the entire claim to the contracting officer. *Newell Clothing,* ¶ 14,774 at 72,920.

### Conclusion

For the foregoing reasons, it is concluded that defendant's motion for summary judgment is denied, in that further evidentiary proceedings are required to resolve the question as to the existence of a Type I changed condition or breach of contract but further certification of the claim under 41 U.S.C. § 605(c)(1) is not required.