**CONCRETE PLACING CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 26–89C.

United States Claims Court.

Feb. 19, 1992.

Phillip S. Oberrecht, Boise, Idaho, for plaintiff.

Julie Shubin, with whom were Thomas W. Peterson, Asst. Director, David M. Cohen, Director, Commercial Litigation Branch, and Stuart M. Gerson, Asst. Atty. Gen., Civ.Div., U.S. Dept. of Justice, Washington, D.C., for defendant. Major Blair D. Jaynes, was of counsel.

## OPINION

SMITH, Chief Judge.

This case involves a government contractor's claim for an equitable adjustment to a contract with the National Guard Bureau, a joint bureau of the Departments of the Army and the Air Force. The contract was for maintenance and repair of an existing concrete aircraft parking apron at Gowen Field in Boise, Idaho. Plaintiff, Concrete Placing Co., Inc. (Concrete Placing), has performed the contract and pursuant to 28 U.S.C. § 1491 and 41 U.S.C. § 605 (Supp. 1991), appeals from the contracting officer's (CO) final decision denying its request for relief. Defendant has filed a counterclaim seeking reimbursement of costs it allegedly incurred in correcting work performed by plaintiff. After a five day trial, and a thorough consideration of the legal issues before it, the court dismisses defendant's counterclaim and directs judgment for plaintiff.

## FACTS

On September 8, 1986, the United States Property and Fiscal Officer for Idaho (USPFO), an agency of the National Guard Bureau, issued a solicitation for maintenance and repair work on a concrete aircraft parking apron at Gowen Field in Boise, Idaho. The parking apron was used by the Idaho Air National Guard for parking military jet aircraft. The solicitation required, among other things, the placement of sealant between the concrete slabs covering areas of the parking apron.[1] Con-

crete surfaces such as those at Gowen Field are composed of slabs, rather than poured as one unit, in order to reduce cracking which occurs when concrete expands and contracts with the seasonal variations in temperature and weather.[2] To prevent cracking, concrete slabs are installed so that there are slight spaces, or joints, between them, thereby giving the concrete room to expand and contract. Rubber-like sealant is typically placed between concrete slabs in order to serve the dual function of filling the joints while at the same time permitting the concrete to fluctuate in size according to temperature and weather conditions. Sealant also prevents moisture, another cause of cracking, from seeping between the slabs. When moisture which has seeped between and below the concrete slabs freezes it can cause heaving, and ultimately cracking, of the concrete.

Prior to bidding on the project, Concrete Placing obtained copies of the plans and specifications and attended a prebid inspection of the work site on September 30, 1986. During that prebid inspection, representatives from Concrete Placing noted that some areas of the existing joints where sealant was to be removed and replaced appeared to be spalled.[3] The evidence showed that bidders questioned the government representative, Major Perkins, on how such areas should be bid since the specifications addressed only uniform joint configurations. Major Perkins instructed the bidders that they should bid in accordance with the details given in the specifications and that any deviation from the plans would be noted during construction and would be handled by routine change order procedures. Another government representative, Lieutenant Argyle, confirmed this instruction to Concrete Placing by phone the week following the site visit.

---

**1.** The solicitation also called for the replacement of certain concrete slabs. Only the sealant portion of the contract, however, is relevant to this dispute.

**2.** Gowen Field was built during World War II. Portions of the aircraft apron first laid in the 1940s are still used today. The original slabs

measure 12½ by 12½ feet. The newer slabs measure 25 by 25 feet.

**3.** Spalling refers to "loose, broken or otherwise deteriorated concrete immediately adjacent to the joints." Specification Section 02501, paragraph 3.3.3.

On January 6, 1987, USPFO awarded the contract to Concrete Placing. The total contract price was $498,474.00. Concrete Placing's bid on the sealant portion of the project was $133,220.00. The government issued its notice to proceed on July 6, 1987. Plaintiff commenced work on July 9, 1987.

Prior to the time sealant operations began, Concrete Placing sought clarification from the government on how the spalled joints were going to be repaired. Spalled joints hamper the sealing process because sealant cannot adhere properly when bits and pieces of sand and gravel from the old concrete become imbedded in the sealant.[4] After considerable discussion, the government prepared a modification to the contract to identify the method of repair. The government then asked Concrete Placing for a price proposal on the repair and that price proposal was submitted. However, the government subsequently decided that the spall repair would only be done at designated portions of the project, instead of throughout the whole apron. The two modifications to the contract which called for joint repair, Modifications Nos. 3 and 5, only covered twenty-five and fifty-five square feet, respectively, of the apron, or less than one percent of surface area encompassed by the project. The specifications indicated that all spalled joints not covered by Modifications No. 3 or 5 were to be filled with sealant.

On March 19, 1987, Concrete Placing submitted for government approval as required by the contract a sealant known as Sonomeric CT-1 (CT-1), manufactured by Rexnord Chemical Products, Inc. (Rexnord). Concrete Placing also submitted materials from Rexnord indicating that after curing CT-1 would meet all of the performance requirements mandated by federal specifications. On March 24, 1987, the CO approved CT-1 for use as a sealant on the aircraft apron project.

Shortly before commencing performance on the Gowen Field apron, Concrete Placing became familiar with CT-1 sealant on an unrelated project at Gowen Field. Plaintiff found that CT-1 did not perform adequately as the sealant bubbled up and extruded out of the joints after being exposed to warm temperatures. Evidence at trial indicated that the problem with the CT-1 on the other project was that it had not properly cured, or solidified, because of the hot, dry conditions which are typical of Idaho summers. CT-1 is a moisture-curing sealant, which means that if it is not exposed to sufficiently humid conditions, it will remain in an unsolidified, liquidy form. If sealant fails to fully cure, it will inevitably extrude onto the concrete surface under hot conditions.

As a precaution for the Gowen Field project, Concrete Placing placed test strips of several sealants in several joints of the apron to determine what sealant would work best. These included CT-1, another sealant manufactured by Rexnord (CT-2), and sealants manufactured by another company, Vulcum. After reviewing the test strips and conferring with Rexnord representatives, Concrete Placing concluded that CT-2 would be the most appropriate sealant for the apron. CT-1, which had been intended for use on the apron, is a one-part sealant which can be applied directly to joints. CT-2 is a two-part sealant made up of two components which requires mixing before application. CT-2 is more costly than CT-1. It is also more costly to apply because the installation process is more labor and equipment intensive. On August 3, 1987, Concrete Placing ordered 1,940 gallons of CT-2 sealant for use on the project. Two days later, on August 5, 1987, Concrete Placing notified the CO, Lieutenant Colonel Sidney B. Call, that it wanted to use CT-2 instead of CT-1.[5] After some dispute, the government, in a September 14, 1987 letter, approved the

---

4. At trial, Lieutenant James M. Heuring, the CO's representative on the apron project, admitted that up to thirty to forty percent of the joints on the old 12½ by 12½ foot slabs were spalled. Very few of the 25 by 25 foot slab joints were spalled.

5. Concrete Placing justifies its purchase of the CT-2 before obtaining authorization from the CO by pointing out that the contract had a liquidated damages clause tied to the date of contract completion.

use of CT–2. The government, however, refused to pay the increased cost for its use. The CO took the position that CT–1, if used properly, could adequately seal the joints.

Central to the dispute between the parties is the condition of the joints prior to contract performance and how that condition affected application of the sealant. The evidence showed that many of the concrete slabs had edges and corners which were irregular, broken, chipped, and spalled. According to the testimony of Virgil Tucker, Concrete Placing's manager on the Gowen Field project, some of the spalled areas reached eighteen inches in width and the joint recesses extended in places up to six inches. While the court, on its site visit, could not "view" the depth, it did see a number of very wide spalls covered with sealant. In the course of applying the sealant, Concrete Placing found that there were substantial voids under the old 12½ by 12½ foot slabs. Excessive amounts of sealant had to be used to fill those voids. At the direction of the CO, Concrete Placing attempted to use bond breaker tape and backer rod in the bottoms of the joints, but because of the irregular configuration of many of those joints, neither approach was effective.[6] Concrete Placing alleges that the poor condition of the joints and concrete slabs required it to use more sealant and to expend more labor, equipment, and material than called for by the contract. Plaintiff also alleges that the specifications did not mandate the use of bond breaker tape or backer rod and that it is therefore entitled to recovery for following the government's direction.

On December 2, 1987, Concrete Placing completed contract performance within the contractually allotted time of 120 days.[7] On December 11, 1987, the government

paid Concrete Placing the remainder of the contract balance. On March 4, 1988, Concrete Placing sent a letter to the CO requesting payment of $63,050.68, plus interest, for reimbursement of the extra costs incurred to complete the joint sealant work. The government rejected the claim for lack of proper supporting documentation and certification. On April 5, 1988, after several attempts, Concrete Placing submitted a properly certified claim. On May 20, 1988, the CO issued a final decision denying Concrete Placing's claim for an equitable adjustment.

Shortly after the government denied Concrete Placing's claim, it noticed that portions of CT–2 failed to adhere to many of the joints on the east end of the project, which contained the newer 25 by 25 foot slabs and, in some areas, the 12½ by 12½ foot slabs. Because of the high summer temperatures, old sealant from earlier work had bubbled up and extruded onto the surface of the concrete slabs. Failures also occurred in spalled joints where the sealant proved stronger than the concrete edges which had deteriorated over time. In these spalled joints the sealant pulled away from the concrete as the sealant could not adhere effectively because of the many particles of sand and gravel from the old, deteriorated concrete slabs. On or before April 28, 1988, the government notified Concrete Placing of the failure. On April 28, 1988, Concrete Placing visited the site and took samples of the failed sealant. After a number of site visits by Concrete Placing and negotiations between the parties, the government insisted that plaintiff return to the project and remove and replace portions of the sealant pursuant to the warranty provisions of the contract.

6. Bond breaker tape, a two-sided adhesive tape similar to masking tape, and backer rod, a flexible, cylindrical foam rubber-like material, were placed in badly spalled joints at the direction of the government in order to create a bottom surface in the joint upon which sealant could be applied. Bond breaker tape and backer rod was placed in many joints in an attempt to prevent sealant from seeping below the concrete slabs. The evidence showed, however, that both the bond breaker tape and the backer rod were not very effective. This was so because sealant seeped around these materials. In several areas it pushed them up to the joint surface.

7. Due to three excusable delays, actual performance spanned 144 days. Modification Nos. 2 and 7 each extended contract performance time by 7 days. Modification No. 5 extended performance by an additional 10 days.

By letter dated July 6, 1988, the government requested a response from Concrete Placing concerning the failed sealant. By letter dated August 1, 1988, Concrete Placing advised the government that it would remove the failed sealant under protest and submit its costs to the government. By letter dated August 3, 1988, the government advised Concrete Placing of the Federal Acquisition Regulation (FAR) 52.246–21 warranty provision in the contract and requested that within five working days Concrete Placing respond to the letter. Plaintiff responded to the government on August 5, 1988, stating that it believed that the failure was not a result of its negligence. Shortly thereafter, by telephone, Concrete Placing notified the government that it wanted to have its experts visit the site before undertaking warranty repair work. On August 31, 1988, by letter, the government requested that by September 12, 1988 Concrete Placing provide a firm date on which it would commence warranty repair work or the government would reprocure the work.

Concrete Placing responded by September 8, 1988, denying that it was responsible under the warranty for the failed sealant. In its response, Concrete Placing addressed the government's concerns about the sealant failures, contending that the failures were due to defective specifications and causes beyond its control. Specifically, Concrete Placing made four assertions. First, Concrete argued that the joints between the 12½ by 12½ foot slabs were in such disrepair that Concrete Placing could not have applied sealant as called for by the specifications. It argued that all concrete spalling and joint irregularities should have been repaired before sealant was applied. Second, Concrete contended that the joints between the 25 by 25 foot slabs were too narrow to allow for the proper expansion of those slabs. Concrete argued that the joint spacing should have been reduced or the joint size increased to

compensate for the compressive stresses which it alleges caused the sealant to extrude from the joint recesses. Third, Concrete asserted that the joints were V–shaped in many places, which caused the sealant to push up out of the joints when the 25 by 25 foot slabs expanded with the heat. Finally, Concrete contended that much of the sealant which extruded was the underlying joint material from previous sealing operations. As the old sealant material compressed, Concrete asserted, it pushed upward, into, around and through the new CT–2 sealant. Concrete contended that while it removed the old sealant in accordance with the specifications, those specifications were defective as they should have required removal of more of the old sealant and to a greater depth.[8]

On September 22, 1988, the government contracted with Intermountain Terrazzo for $22,990.00 to repair the approximately 16,-300 linear feet of failed sealant. Using CT–2 sealant, Intermountain repaired the problem areas. The project was completed on November 2, 1988. Final and full payment was made to Intermountain on November 30, 1988.

On December 20, 1988, the CO issued his final decision with respect to the government's claim against Concrete Placing for the repair work allegedly covered by the warranty. The CO concluded that the government had a valid claim against Concrete Placing for $22,990.00, the cost of the corrective work done by Intermountain Terrazzo to remove and replace sealant failures. On December 21, 1988, the CO sent Concrete Placing a Demand For Payment in the amount of $22,990.00 to be paid within thirty days. Concrete Placing was notified that any amount not paid within the thirty days would accrue interest from the date of the demand. By letter dated January 16, 1989, Concrete Placing, through its attorney, notified the CO that it

---

8. The specifications provided that "the existing joint sealer material shall be completely (100%) removed ... down to a minimum depth of one (1) inch below the concrete slab surface...." Specification No. 84001, TP1–03(3)(b)(2). Concrete Placing alleged, and the evidence showed,

that in order for new sealant to be effective (whether it be CT–2 or any other sealant) the old sealant had to be completely removed first. In many if not most of the joints, this meant removing old sealant well below the one inch depth the specifications required.

would not reimburse the government. On March 17, 1989, the CO amended his final decision, finding that Concrete in fact owed the government $25,741.00. Concrete Placing filed its claim in this court on January 17, 1989.

## DISCUSSION

### I. Defective Specifications

The central issue for the court to decide in this case is whether, as plaintiff alleges, the specifications were defective. Resolution of this issue will determine whether plaintiff is entitled to an equitable adjustment to the contract for the labor, equipment and material costs associated with applying CT–2 sealant in the joints between the concrete slabs of the apron. Resolution of this issue will also determine the merits of defendant's claim that plaintiff failed to satisfy the contract requirements and therefore must assume liability to the government for breach of warranty.

■ It is well-established that the government warrants the sufficiency of its specifications. *Southwest Welding & Mfg. Co. v. United States,* 413 F.2d 1167, 188 Ct.Cl. 925 (1969); *Baltimore Contractors, Inc. v. United States,* 12 Cl.Ct. 328 (1987). "[I]f the contractor is put to additional expense as a result of defective or impossible government specifications, it is entitled to an equitable adjustment." *Baltimore Contractors,* 12 Cl.Ct. at 341. In general, a contractor can obtain an equitable adjustment only if it can demonstrate that the specifications are design rather than performance specifications. *Dewey Electronics Corp. v. United States,* 803 F.2d 650, 658 (Fed.Cir.1986). "Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be obtained and leave it to the contractor to determine how to achieve those results." *Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1582 (Fed.Cir.1989). Only in the relatively rare case where the specifications call for a performance which is impossible to achieve can a contractor obtain an equitable adjustment for defective performance specifica-

tions. Here, plaintiff must demonstrate that the specifications are design rather than performance in nature as the performance required by the contract was possible to achieve.

■ In this case, the court finds that the sealant project specifications were design specifications. The specifications clearly articulated the type of sealant to be used, the method for cleaning the sealant from the joints, the amount of old sealant to clean from the joints and the application procedures and equipment to be used. In fact, in many respects the specifications were quite detailed. The sealant was required to be "[j]et-fuel resistant, designed for cold pressure application meeting the provisions of Federal Specification SS–S–200D or SS–S–1614." Before installing the new sealant, Concrete Placing was to "[c]lean the joints thoroughly with compressed air, sandblasting and washing." In applying the new sealant, plaintiff was to ensure that sufficient sealant be placed in the joints "so that upon completion of the work the surface of the sealing [would] not be more than ⅛ inch below the level of the pavement surface after the sealing material ha[d] set-up/cured out." Where needed, plaintiff was required to use bond breaker materials, *i.e.* bond breaker tape and backer rod. Finally, plaintiff was required to obtain approval from the CO before using a particular brand of sealant. Based upon its reading of these and other provisions, the court can only characterize the specifications as design specifications.

Having determined that the specifications were design specifications, the court must now decide whether they were defective. Based on the evidence and testimony presented at trial, the court finds that the specifications were indeed defective. The court bases its conclusion on four findings it made as a result of trial and a site visit to Gowen Field. First, the specifications did not properly reflect the true condition of the joints to be filled with sealant. Plaintiff and the other bidders submitted their proposals based solely on the specifications and a brief prebid site visit. The specifications failed to address the magni-

tude of the spalling problem. The joints depicted in the specifications were all in good condition; none of the cross section diagrams illustrated broken, chipped or irregular joints. Second, the specifications incorrectly indicated that sealant could have filled the spalled joints and chipped concrete which were present throughout the apron project. A representative of Rexnord, Michael Devany, and plaintiff's expert, Frank Gaus, convincingly testified that CT–1 sealant is not intended to repair or fill spalled concrete or joints. CT–1 sealant is meant to be used solely as a sealant between joints which are in good repair. The specifications thus did not reflect the government's failure to repair the concrete and joints before the sealing process. Third, the specifications did not provide for the proper pre-sealing preparation of the joints around the 25 by 25 foot slabs. These joints were in some areas too narrow to allow for the proper expansion of those slabs. Some of the 25 by 25 foot slab joints were also V-shaped, which caused the sealant to extrude out of the joints when they were subjected to warm temperatures. They should have been trench-like or a deeper U-shape. Finally, the specifications failed to account for the old sealant from prior sealing projects. The specifications should have called for more removal of old sealant and to a greater depth because much of it extruded through the new CT–2 sealant.

The court's conclusion that the specifications were defective is buttressed by the admissions of several government representatives that they were aware that the CT–2 sealant was not only the superior, but the only feasible, sealant for the apron project. The CO, Lieutenant Colonel Sidney Call, testified that he believed Concrete Placing had "some legitimate concerns" that the suppliers would not warranty the CT–1 as a sealant on the project. Michael Devany, the Rexnord representative, testified that Lieutenant James M. Heuring, the CO's representative, indicated to him over the phone several times that he realized that CT–2 was the superior sealant, especially considering the spalled joints. In his direct testimony at trial, Lt. Heuring con-

firmed that he knew that CT–2 was the more appropriate sealant and indicated that he observed firsthand the test strips employed by Concrete Placing before it ultimately elected to use the CT–2 sealant. These admissions, taken together with the evidence presented by plaintiff, leave the court no option but to find for plaintiff in regard to the defective character of the specifications. This defective character required the contractor to use the significantly more expensive CT–2 sealant. If the defects had not been present, CT–1 could have been used.

## II. Equitable Adjustment

Based on its finding that the specifications were defective design specifications, the court holds that plaintiff is entitled to an equitable adjustment to the contract. Plaintiff shall be awarded all costs directly associated with the installation of the CT–2 sealant. Plaintiff's recovery shall include costs relating to all materials, extra labor, and additional equipment relating to the CT–2 installation portion of the contract.

The court notes that this result is mandated not only by controlling case law, but also by basic contract principles which underlie the procurement system. The allocation of risk between the government and a contractor in this type of case is fairly clear. In exchange for the right to direct specifically how a project shall be performed, the government warrants that its directions are not defective. *See Spearin v. United States*, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918) ("[I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications."). In exchange for that warranty, the contractor must carefully perform according to the government's direction or risk breaching its contract and losing money. *See Utility Contractors, Inc. v. United States*, 8 Cl.Ct. 42, 48 (1985) ("It is well settled that where one agrees to do, for a fixed sum a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are en-

countered."), *aff'd*, 790 F.2d 90 (Fed.Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 53 (1986). This balancing of risks is important for it preserves the integrity of a procurement system which depends on each party meeting its duties and bearing the risk allocated to those duties. Thus, in order for the government to best ensure that future contractors are willing to bid at the lowest possible price and the highest possible quality it must willingly compensate where it bears the risk. As the court observed in *Shank–Artukovich v. United States*, 13 Cl.Ct. 346, 355 (1987), *aff'd*, 848 F.2d 1245 (Fed.Cir.1988), in the context of discussing differing site conditions, by allowing contractors to seek equitable adjustments the government is able "to prevent bidders from increasing their bid prices to protect against misfortunes resulting from unforeseen developments, and thus avoid turning a construction contract into a 'gambling transaction,'" (quoting *J.F. Shea Co. v. United States*, 4 Cl.Ct. 46, 50 (1983), *aff'd*, 754 F.2d 338 (Fed.Cir.1985)).

## III. Breach of Warranty

At trial, defendant sought to substantiate its counterclaim for damages allegedly incurred as a result of having to reprocure some of the sealing work performed by Concrete Placing. Defendant based its counterclaim on the standard warranty clause included in the contract between the parties. The warranty provision, FAR clause 52.246–21, "Warranty of Construction," provided in pertinent part:

> (a) ... the Contractor warrants ... that the work performed under this contract conforms to the contract requirements and is free of any defect in equipment, material, or design furnished, or workmanship performed by the Contractor ...
>
> (b) This warranty shall continue for a period of 1 year from the date of final acceptance of work....
>
> (c) The Contractor shall remedy at the Contractor's expense any failure to conform, or any defect....

48 C.F.R. § 52.246–21 (1991).

The evidence clearly and convincingly indicated that overall Concrete Placing did a good job on the apron project. In fact, several of the government representatives testified that they were satisfied with Concrete Placing's workmanship. The following testimony of Lt. Heuring, the CO's representative on the project, was representative.

> Mr. Oberrecht: In fact, Concrete Placing Company, in your estimation, did a workman-like job, didn't they?
>
> Heuring: When you consider the entire project, which involved quite a bit more than the joint sealant, excavation, demolition, compaction, overall they did a good job, yes.
>
> Mr. Oberrecht: And in fact, it's your impression that Concrete Placing Company was striving to comply with the plans and specifications in cleaning the joints?
>
> Heuring: Yeah, I think they were trying to, yes.

Heuring testimony, October 17, 1990, Transcript at 478. Lt. Heuring also testified that the government never rejected any portion of the installed sealant, as it has the authority to do under the contract. Sergeant Robert March, who replaced Lt. Heuring as the CO's representative on the project, also testified that he never rejected any portion of the sealant installed by Concrete.

More importantly, the evidence showed that the sealant failures which occurred after Concrete Placing completed performance were not due to its work. Plaintiff's expert, Frank Gaus, convincingly testified that the sealant failures which were evident after Concrete Placing performed the contract were the result of the poor condition of the joints. Gaus indicated that the spalled joints should have been repaired before the sealant portion of the project was even bid on.

> Mr. Oberrecht: ... Now, based on your review of the plans and specifications, and based on your hearing me relate this testimony to you, do you have an opinion as to whether or not bidding on the quantities for sealant on this project, in accordance with the plans and specifications themselves, and in accordance with

the joint detail on page 5 of the plans, was reasonable or not?

Gaus: I think it was very reasonable. I would have accepted Major Perkins' word, as a representative of the Air Force, that they were going to address [the spalling problems]. Because in my opinion 80 percent of this job is spall repair. The spall repair should have been addressed first, whether it was going to be replaced two years down the road or not. They had problems out there with these spalls and the loose aggregate is evident in these pictures. The whole area should have been shut down right then. No aircraft on that thing until he had it fixed. And the job should have been advertised as a spall and joint repair job, not joint repair and crack fill. It wasn't even in the title.

Gaus testimony, October 18, 1990, Transcript at 666–67. The court found Mr. Gaus a clear, coherent and highly credible expert. Based on this evidence and its finding that the specifications were defective, the court must dismiss defendant's breach of warranty counterclaim.

## IV. Damages

■ In its original March 4, 1988 claim, plaintiff sought damages totaling $63,-050.68. Plaintiff derived this figure from an analysis of the actual costs associated with installing the CT–2 sealant. Plaintiff enumerated the actual cost damage figures as follows:

| | |
|---|---|
| Extra material used to fill irregular joints— | $28,309.50 |
| 15% for overhead— | $ 4,246.45 |
| 10% for profit— | $ 3,255.60 |
| Extra labor and equipment to clean and seal irregular joints— | $ 8,874.40 |
| 15% for overhead— | $ 1,331.16 |
| 10% for profit— | $ 1,020.56 |
| Extra costs to upgrade to CT-2 sealant— | $12,658.50 |
| 15% for overhead— | $ 1,898.78 |
| 10% for profit— | $ 1,455.73 |
| TOTAL CLAIM | $63,050.68 |

See Plaintiff's Exhibit 86(b).

At trial, plaintiff sought to amend its damages calculation during the testimony of its contract administrator, Kevin Cunha. Mr. Cunha based his alternative theory of damages on a total cost approach. He justified his revised figures on the fact that

he had more time to go through the certified payrolls. Plaintiff enumerated the total cost approach damages as follows:

| | |
|---|---|
| Labor (48.75 days × 8 hours × $50)— | $53,779.80 |
| Equipment ($1,108/day × 48.75 days)— | $54,015.00 |
| Materials— | $58,498.00 |
| 15% overhead— | $24,943.92 |
| 10% profit— | $19,123.67 |
| Total amount earned— | $210,360.39 |
| Less amount of contract paid— | ($133,220.00) |
| AMOUNT DUE (TOTAL CLAIM) | $77,140.39 |

See Plaintiff's Exhibit 86(a).

Defendant contests the total cost approach calculations plaintiff introduced at trial. Defendant correctly points out that the Claims Court generally has viewed the actual cost approach as preferable.

> Under the total cost theory, a contractor seeks to recover the difference between the actual costs incurred in contract performance and its bid or estimated costs. The total cost theory of recovery was not favored by the United States Cour of Claims and was tolerated only when no other mode of recovery is available, and when the reliability of the supporting evidence was fully substantiated.

G.M. Shupe, Inc. v. United States, 5 Cl.Ct. 662, 676 (1984) (citation omitted).

■ However, contractors are not precluded in this court from receiving damages based on a total cost approach. See, e.g., Servidore Constr. Corp. v. United States, 19 Cl.Ct. 346, 384–86 (1990) ("[I]n some types of work, and for certain types of changed conditions, the total cost approach may be the only viable means to identify costs."), aff'd, 931 F.2d 860 (Fed. Cir.1991). In order to recover under a total cost approach, the contractor must meet four criteria, "all of which must be demonstrated before a total cost recovery will be permitted." S.W. Electronics & Mfg. Corp. v. United States, 655 F.2d 1078, 228 Ct.Cl. 333, 347 (1981). These criteria have been articulated as follows:

> The acceptability of the [total cost] method hinges on proof that (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was

realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses.

*WRB Corp. v. United States,* 183 Ct.Cl. 409, 426 (1968); *see also Skip Kirchdorfer, Inc. v. United States,* 14 Cl.Ct. 594, 605 (1988). Based on the evidence presented by plaintiff at trial, the court is satisfied that the latter three criteria have been met. The testimony of John Ferguson and Hank Lohse supports plaintiff's contention that the bid was reasonable and reasonably prepared. Plaintiff has also demonstrated that its actual costs were reasonable. Plaintiff's damage expert, Mr. Cunha, testified that he calculated the total cost damages from an analysis of the bid notes and the actual labor records, time cards and invoices from the project. Mr. Cunha also testified that the total cost figure more accurately reflected Concrete Placing's damages, an assertion virtually uncontested by the government. Finally, this court has determined that the specifications were defective. Plaintiff thus has met its burden of showing that it was not responsible for the added expenses associated with installing the CT–2 sealant.

Whether plaintiff has satisfied the first criteria is a more difficult inquiry. Although it does not necessarily so indicate, the fact that plaintiff calculated an actual cost figure does seem to lend support to the contention that actual costs were not impossible or highly impracticable to determine with a reasonable degree of accuracy.[9] In its attempt to prove that it has met this first criteria, plaintiff points out that the evidence showed that the estimated 16,300 linear feet of spalled joint encountered was staggered throughout the 120,000 linear feet project. Plaintiff contends that "there is no precise formula by which actual additional costs can be computed and segregated from those costs which plaintiff would have incurred had there been no government caused difficulties."

The court finds plaintiff's position convincing. Based on the fact that the spalled joints were spread intermittently throughout the project, the court cannot conceive of a method of distinguishing between those costs solely incurred as a result of the government's defective specifications and those only covered by the original bid which would be both credible *and* reasonable. An additional factor which forces the court to award the total cost figure is the government's failure to contest effectively plaintiff's alternative damage figures. *See* Cunha cross examination, October 16, 1990, Transcript at 397–99; Defendant's Response to Plaintiff's Post Trial Brief, filed December 14, 1990. Although the court recognizes that it is not preferable for a contractor to make an amendment to a damages claim at the time of trial, the court is satisfied, based on the testimony of Mr. Cunha, that this particular amendment is meritorious and justified by the factual difficulties.[10]

## CONCLUSION

For the reasons set forth above, the court dismisses defendant's counterclaim and directs judgment for plaintiff in the amount of Seventy Seven Thousand, One Hundred Forty Dollars ($77,140.00), together with interest thereon from April 5, 1988. Interest is to be computed according to the Contracts Disputes Act, 41 U.S.C. § 611 (1988). Plaintiff will have sixty days from the issuance of this opinion to file, if it so elects, an application for attorney fees and expenses under the Equal Access to Justice Act. 28 U.S.C. § 2412(d)(1)(B) (Supp.1991).

IT IS SO ORDERED.

---

9. Just because plaintiff has submitted an actual cost figure, however, does not necessarily compel the conclusion that this figure is the most accurate reflection of the damages plaintiff incurred.

10. The court notes that it is permissible for a contractor to amend its damage claim at the time of trial. *See J.F. Shea Co.,* 4 Cl.Ct. at 55.